[Civil No. 3408. Filed October 4, 1934.]

[36 Pac. (2d) 568.]

JAMES BENJAMIN BUTTON and NATIONAL SURETY COMPANY, a Corporation, Appellants, v. A. M. NEVIN, Appellee.

Mr. Thomas A. Flynn, for Appellant Button.

Mr. Henderson Stockton and Mr. Emmett Feighner, for Appellant National Surety Company.

Mr. Herbert B. Shoemaker and Mr. Frank H. Swenson, for Appellee.

LOCKWOOD, J.—This is an action brought by A. M. Nevin, hereinafter called plaintiff, on his behalf and as assignee of some thirteen other parties, against James Benjamin Button, at one time superintendent of banks of the state of Arizona, and National Surety Company, a corporation, the surety on Button's official bond, hereinafter called defendants, to recover from them certain sums of money deposited by plaintiff and his assignors, in Farmers' Commercial State Bank, hereinafter called the bank, after the bank had been closed as in an unsafe condition and later permitted to reopen by Button acting in his official capacity. The complaint is voluminous, and we do not set it forth in full, but it alleges, in substance, that Button, as such superintendent, after closing the bank, wilfully and knowingly allowed it to reopen while it was in an unsafe, unsound, and insolvent condition, whereby plaintiff and his assignees lost their deposits. The case was tried to a jury, which returned a verdict in favor of plaintiff in the sum of $20,000, and, after the motion for new trial was overruled, this appeal was taken.

There are forty-one assignments of error, which are presented by defendants under twenty proposi-

tions of law, and we shall consider them according to the legal issues raised in such order as seems most logical. In order to do this, it is necessary that we first make a brief statement of the facts in the case as necessarily found by the jury.

For some time prior to the 27th of February, 1930, there had been in existence in Yuma county a state bank known as the E. G. Caruthers State Bank of Somerton, conducting a general banking business in that town. On the date named defendant Button, then superintendent of banks, received a telephone call from the cashier of the bank to come to Somerton immediately. He did so, and some time before noon of February 28th ordered the bank closed, and then commenced, through his assistants, a general inventory of the assets and liabilities of the closed bank, notifying its various correspondents and depositors of his action. Commencing with the 10th of March, Button spent some nine days personally in Yuma county meeting people interested in the bank and investigating local conditions as they related to it. When the inventory was completed, it was apparent to Button that the condition of the bank was such that it should not be allowed to reopen unconditionally, but for various reasons he deemed it best to allow such reopening if certain conditions were complied with. The inventory showed a total of nominal assets of approximately $398,000. Of this $290,000 was represented by loans and discounts, while the bank owed in demand deposits, cashier's checks, and similar items about $350,000. Its capital stock was then $15,000, and it had no surplus or unearned profits, so that any considerable impairment of the loans and discounts would entirely wipe out the capital stock and leave the bank in a hopelessly insolvent condition. In addition to this,

a very large percentage of the loans had been made in violation of section 223, Revised Code of 1928, which reads in part as follows: ''The total liability to any bank of any person for money borrowed shall at no time exceed fifteen per cent. of the amount of the capital stock paid in and of the surplus earned and set aside as a surplus fund of such bank. . . . If the superintendent finds that a bank has allowed loans to be made in excess of the amount provided for in this section, he shall immediately instruct the officers and directors of said bank to charge off enough of said loan or loans to bring it within the required limitation, . . . '' and Button had repeatedly notified the bank before it closed that the bulk of these loans were either slow, doubtful, or a loss.

Under these circumstances, he laid down certain conditions for the reopening of the bank. The first was that the capital stock should be increased to $75,000. The second was that three lines of indebtedness, amounting in the aggregate to about $160,000, should be substantially reduced, and the third that 400 shares of the new capital stock of the bank should be deposited with it as security against any losses that might be incurred through loans. To meet these conditions, the following things were done: Omitting the technical manner of procedure, three parties to whom the bank owed, either on deposits, rediscounts or cashier's checks, various sums, accepted capital stock at par to the amount of $60,000, which they paid for by cancellation of part of what the bank owed them, and in addition donated $15,000 of such deposits to be held as a surplus account by the bank. The only actual cash which was added to the bank's resources by the transaction was $5,000, which was newly deposited in the bank, and then a

check therefor given by the depositor to the bank. The indebtedness of $160,000 was reduced in the following manner: One debtor owed $72,000, and two of the creditors of the bank consented to an application thereon from what the bank owed them of $52,000 leaving this particular debt amounting to about $20,000. The second debtor originally owed about $36,000. The president of the bank transferred to it certain certificates of capital stock of the Yuma Trust & Holding Company at an agreed value of $25 per share, and $23,000 of the debt was thus canceled, leaving a balance due the bank of about $13,000. The third line of indebtedness amounted to $53,000, which was secured by a second mortgage on real estate in the sum of $25,000, and by a chattel mortgage on certain farming implements and crops. When the bank was reopened, this indebtedness was carried forward as an asset of the reopened bank, but shortly thereafter, in accordance with a previous understanding with Button, the mortgage was foreclosed under circumstances which would indicate that the bank realized $12,000 on the debt and had for the balance thereof a deficiency judgment against the debtor of $20,000 and apparently about the same amount in unsecured notes. After these things were done, Button secured from about two-thirds of the depositors of the bank an agreement that, if it did reopen, they would change their general deposits to time deposits for a certain period, but the agreement expressly provided that it should not in any way affect new deposits. Plaintiff and his assignors were not among those signing the agreement. The consideration was that the bank should perform all the requirements imposed on it by Button as a condition to reopening.

Not satisfied, however, with doing this, Button filed a petition in the superior court of Yuma county en-

titled "In the Matter of the Estate of the Caruthers State Bank, now Farmers Commercial State Bank." In this petition he set up that he, as superintendent, had closed the bank on the 29th of February; that the bank had amended its articles of incorporation changing its name and increasing its capital stock of $75,000, which change and increase had been approved by him; that the capital stock had been paid, and that satisfactory arrangements had been made by the then creditors and depositors of the bank and its stockholders and directors to insure a continuance of its operation; that he had taken no steps towards liquidation of the bank, and did not believe it was in a condition which needed liquidation, and his prayer was that his action should be confirmed and the bank authorized to reopen. This petition was filed on the 18th day of March, and an order immediately made, without notice to anyone, approving the reopening. Under these circumstances, the bank did reopen, and plaintiff and his assignors deposited therein various sums of money.

Some months later, the bank was finally closed by the superintendent, at which time plaintiff and his assignors had on deposit therein the sums of money for which this suit is brought. We shall refer to any other facts from time to time in the course of this opinion as may seem proper.

As we have stated, the action is based on the theory that the superintendent of banks was derelict in his official duties in permitting a bank which he had closed to reopen when it was in an unsafe and unsound condition. There can be no question that as a matter of law, if the state superintendent of banks wilfully and knowingly neglects or fails to perform his official duties, he is liable upon his bond for any

damages suffered by parties through such neglect or failure. Sections 71, 74 and 75, Rev. Code 1928.

It is claimed that defendant Button wilfully neglected to perform his official duties in two manners: First, that he disregarded two positive commands of the statutes affecting the safety and sound condition of the bank; and, second, that he exercised gross negligence in allowing the bank to continue in business when he knew that it was generally insolvent. We consider first the claim of violation of the statutes. The first is that the increased capital stock was, to the knowledge of Button, not paid in cash. Section 221, Revised Code of 1928, reads in part as follows:

" . . . The certificate of incorporation shall not be issued until it appears to the corporation commission by affidavit of at least three of the incorporators that the proposed corporation has the requisite amount of capital stock paid in; nor shall the corporation commission issue its certificate of amendment to the articles of incorporation of any banking corporation until it shall appear to it by affidavit that all of the increased capital has actually been *paid in cash*. . . . " (Italics ours.)

While this section does not specifically state that the superintendent of banks shall require a bank, which has increased its capital stock after it has been closed, as a condition of reopening that the increase shall actually be paid in cash, yet we think it does so in effect. Certainly it will not be claimed that the Corporation Commission, if it knew that a showing made by affidavit as required by the statute on this point was untrue, should issue its certificate, and it follows that a bank superintendent, who knows that the law has not been complied with, and that the affidavit is false, is derelict in his duty if he wilfully and knowingly allows a closed bank to reopen under such circumstances. It is no justification for such

conduct that what was done was in his opinion equivalent to the payment of cash, because it reduced the liabilities of the bank to that extent. The legislature has stated in the statute precisely what a bank must do when it increases its capital stock, and it is not for the superintendent of banks to substitute his own judgment of "something just as good." We are of the opinion that the failure of defendant Button to see that the law in regard to the payment of the increased capital stock in cash was complied with before the bank reopened was a violation of his official duty, and any person injured thereby had the right of action on his official bond.

But this is not the only statute which was violated. Section 223, *supra,* had repeatedly and for years, to the knowledge of Button, been violated by the bank. The statute expressly provides, not that he "may," but that he "shall," when he discovers such a condition, "immediately instruct the officers and directors of said bank to charge off enough of said loan or loans to bring it within the required limitation." We think that his action in regard to these excess loans existing, to his knowledge, over a term of many years, was a violation of his official duty. It is doubtless true that, if he had enforced the law as soon as he knew of its violation, the bank would have been closed much earlier, and that he hoped by his delay it would eventually work out its problems and become solvent, but it was not his right or privilege to substitute his judgment for that of the legislature as to what should be done under the circumstances, and, if this be true while the bank was still open for business, it is doubly true that, when it had once been closed, it was a gross violation of official duty for him to permit it to reopen and receive new deposits when its excess loans carried as assets

were in a far greater amount than that permitted by law.

Defendants urged that the legal prohibition of section 223, *supra,* applies only to loans and to no other form of indebtedness, and that there is no evidence that the indebtedness which it is claimed violated the statute consisted of loans. It is true that we held in *Kingsbury* v. *State,* 28 Ariz. 86, 235 Pac. 140, 142, "that the inhibition was expressly directed only against an indebtedness 'for money borrowed' and not for any other purpose," and we repeat that holding, but we are satisfied from the evidence that the only reasonable implication is that the indebtedness was for money borrowed. The statement of resources and liabilities made under the instructions of defendant Button himself, and showing the condition of the bank on February 28, 1930, show these various items of indebtedness as "bills receivable," which would presumptively indicate notes. Further than that the notes themselves, for two of the lines of indebtedness referred to, show plainly on their face that they were given to the bank. We think, in the absence of evidence to the contrary, that the only reasonable inference is that they were for money loaned, and there is not a scintilla of evidence in the record that they were for anything else. Indeed, defendants do not claim they were not for money loaned, but merely that plaintiff has failed to prove that they were.

We are of the opinion that the fact that defendant Button allowed the closed bank to reopen when to his knowledge the increased capital stock had actually not been paid in in cash, and when part at least of the excess loans, aforesaid, had not been charged off sufficiently to bring them within the requirements of the statute, is as a matter of law conclusive that he

allowed it to reopen under conditions rendering it unsafe and inexpedient for it to continue in business, and was such a violation of his official duty as would authorize, a recovery of all persons injured thereby upon his official bond. It is no defense that he believed in good faith, or that the citizens of Yuma, who had knowledge of the situation, also believed, that in the long run it was for the best interest of all parties concerned that the bank be allowed to reopen upon the conditions which were actually complied with. Public officials may not violate the plain terms of a statute because in their opinion better results will be attained by doing so. They have but one duty, and that is to enforce the law as it is written, and, if the effect of their action is disastrous, the responsibility is upon the legislature, and not upon them. But, if they knowingly, even though with the best intentions in the world, violate the law, they and their bondsmen must take the consequences.

With this statement of the fundamental principles of law involved in the action, let us see if anything appears in the record which, notwithstanding the undoubted dereliction of duty, as aforesaid, will relieve defendants from responsibility. It is first urged that the order of the superior court will protect them. An order of a court made without jurisdiction is of course void. Under the old system of banking in Arizona, the superior courts of the state were charged generally with the supervision of closed banks; the superintendent of banks being, as stated by the statute then in force, in effect a receiver of any closed bank, acting under the direction of the court. The Session Laws of 1922, carried forward into the Code of 1928, changed that situation materially. Section 245, Revised Code of 1928, reads in part as follows:

"§ 245. *Method of Liquidation or Reorganization.* Whenever it shall appear to the superintendent that a bank has violated the provisions of its articles of incorporation or any law of this state, or is conducting its business in an unsafe or unauthorized manner, or if the capital of any bank is impaired, . . . or if from an examination or report provided for the superintendent shall have reason to conclude that such bank is in an unsound or unsafe condition to transact business, or that it is unsafe and inexpedient for it to continue business, the superintendent may forthwith take possession of the property and business of such bank and retain such possession until such bank shall resume business, or its affairs be finally liquidated as herein provided.

" . . . Such bank, may with the consent of the superintendent, resume business upon such conditions as he may approve. Whenever a bank whose property and business the superintendent has taken possession of, deems itself aggrieved thereby, it may at any time within ten days after taking such possession apply to the superior court of the county in which such bank is located to enjoin further proceedings; and said court may, after a full hearing, dismiss such application or enjoin the superintendent from further proceeding and direct him to surrender such business and property to such bank."

It will be seen by this section that the superintendent of banks, when in his judgment certain conditions exist, may take possession of a bank until such time as it resumes business or is liquidated. If it resumes business, it is by the consent of the superintendent alone. If the bank is aggrieved at the action of the superintendent, it may bring a proceeding to test it, but there is nothing in the section giving the superior court jurisdiction of the matter otherwise.

Section 247, Revised Code of 1928, however, reads as follows:

"§ 247. *Relations of Court and Superintendent When Acting as Liquidating Agent.* When the af-

fairs of a bank have come into the hands of the superintendent for liquidation, the relations between the court and the superintendent shall be the same as the relations of the court and a receiver under the laws now existing, and the court shall have the same authority and jurisdiction over the superintendent in such matters of liquidation as it has over receivers appointed by the court, unless herein otherwise provided.''

This section by its terms applies only *when the bank is to be liquidated.* In the present case, the petition filed in the court not only does not set up that the bank is being or is to be liquidated, but alleges affirmatively that no steps had been taken toward liquidation and that none are necessary. We are of the opinion it shows on its face that the superior court was without jurisdiction to make any order in the premises whatsoever.

Since it appears clearly, from the law and evidence, that defendant Button is liable on his bond for any damages caused by reason of his failure to perform the duties imposed on him by law, to wit, to require as a condition precedent to the reopening of the bank that the increase in the capital stock be paid in cash, and that all loans be reduced to the statutory limit, what is the rule for ascertaining such damages, and was it followed at the trial? It is the contention of plaintiff that the measure of damages is the amount of the various deposits, less any sums he may have received to the time of trial as credit thereon. It is the position of defendants that it is, in substance, the net loss which plaintiff will ultimately sustain, after a complete liquidation of the bank, and that the burden of proof is on plaintiff to show what the result of such liquidation will probably be.

Neither plaintiff nor defendants have cited to us a case where on similar facts the precise question

before us was fully discussed and determined. The case of *State* v. *Title Guaranty & Surety Co.,* 27 Idaho 752, 152 Pac. 189, 193, is probably the nearest in facts. It was an action by the state against the state banking commissioner of Idaho and his surety on behalf of various depositors of a closed bank. There, as here, the theory of liability was a dereliction of official duty. The trial court instructed the jury that the measure of damages was the amount of the deposits, plus interest from the day the deposit was made. The Supreme Court in effect approved the instruction, except that it said the interest should have been from the time the bank closed. It was urged by defendants therein that the suit was prematurely brought, because the loss would probably be minimized, when the bank was finally liquidated, by assets on hand. The court refused to consider the contention, because it was not first made in the trial court, but did say:

" . . . Furthermore, should additional funds arise from the disposal of such assets as still remain in the hands of the receiver, the surety company, upon payment of the judgment, may be subrogated to the rights of the persons in whose behalf this action is brought."

The question has frequently arisen where statutes make a public officer or banker liable, either civilly or criminally, for money "lost" by reason of his acts, as to when the "loss" occurs, and it is generally held that, where it involves bank deposits, the full deposit is "lost" when the bank fails to pay on demand, even though ultimate liquidation might recoup something, and in civil cases that the surety is protected by the right of subrogation. *Buhl Highway Dist.* v. *Allred,* 41 Idaho 54, 238 Pac. 298; *State* v. *Krasher,* 170 Ind. 43, 83 N. E. 498; *Meadowcroft*

*et al.* v. *People,* 163 Ill. 56, 45 N. E. 991, 54 Am. St. Rep. 447, 35 L. R. A. 176; *State* v. *Beach,* 147 Ind. 74, 43 N. E. 949, 46 N. E. 145, 36 L. R. A. 179; *Queenan* v. *Palmer,* 117 Ill. 62, 619, 7 N. E. 470, 613.

Counsel for defendants have cited to us, as sustaining their position, the cases of *Northwestern Nat. Bank* v. *People's State Bank,* 109 Kan. 506, 200 Pac. 278, 19 A. L. R. 551, and *Jefferson County Savings Bank* v. *Hendrix,* 147 Ala. 670, 39 So. 295, 1 L. R. A. (N. S.) 246.

It will be seen on examining these cases and the others on which they are based that they all involve an attempt to charge a bank for the amount shown on the face of the instrument, for failure to collect a check, draft or other evidence of indebtedness, and the reasoning sustaining the decisions is, "It is not certain that even with due diligence the delinquent bank would have collected the full amount of the debt. Therefore the plaintiff can recover only what he has actually lost, after all possibility of minimizing the loss has been exhausted." Assuming, without admitting, that under such circumstances the rule laid down in the cases just cited is correct, we fail to see its application to facts like those involved herein. In them the offending bank had received something of claimants which might or might not be of value. Here it had received actual money belonging to them. There its obligation to pay was limited to what it actually could, with due diligence, collect. Here it was fixed and definite for the full amount of the deposit.

We are of the opinion that on both reason and authority in cases like this the measure of damages is the full amount of the deposits, plus legal interest from the date the bank closed, less any sums actually recovered at the date of trial. If at a later date

further amounts are paid as dividends, the right of subrogation no doubt exists, in equity if not by statute. *State* v. *Title Guaranty & Surety Co., supra; Buhl Highway Dist.* v. *Allred, supra; Boaz* v. *Ferrell,* (Tex. Civ. App.) 152 S. W. 200; *Pond* v. *Dougherty,* 6 Cal. App. 686, 92 Pac. 1035; *Forest County* v. *Poppy,* 193 Wis. 274, 213 N. W. 676; 60 C. J. 772.

From what we have said it is apparent that on the law and the undisputed facts it was the duty of the trial court to instruct a verdict in favor of plaintiff in the sum of $20,000, unless it appeared affirmatively from the evidence, either (a) that plaintiff and his assignors had knowledge, long enough before the bank finally closed to have withdrawn their deposits, of the wrongful acts of defendant Button, or (b) that they have actually received credits on their deposits sufficient to reduce them below the amount of the verdict. Our attention has not been called to any evidence to this effect, nor is it suggested that any exists. Such being the case, it is unnecessary to consider the other legal propositions raised by the assignments of error. Even if all of them were well taken, it would be both foolish and futile to reverse a case for technical error when the result must be the same at a new trial.

The judgment of the superior court of Maricopa county is affirmed.

ROSS, C. J., and McALISTER, J., concur.