Alexander TCHEREPNIN et al.,
Plaintiffs-Appellees,

v.

Joseph E. KNIGHT and Justin Hulman,
Defendants-Appellants.

Alexander TCHEREPNIN et al.,
Plaintiffs-Appellees,

v.

CITY SAVINGS ASSOCIATION, Dennis
Kirby, Harry Hartman and Louis
Kwasman, Defendants-Appellants.

Alexander TCHEREPNIN et al.,
Plaintiffs-Appellees,

v.

Robert FRANZ et al., Defendants-
Appellants.

Nos. 15631, 15633, 15634.

United States Court of Appeals
Seventh Circuit.

Jan. 20, 1967.

George S. Lavin, Leonard Schanfield, William P. Rosenthal, Norman L. Rothenbaum, Chicago, Ill., for C. Oran Mensik, Robert Franz, Joseph Talarico, Jr., Robert M. Kramer, Stanley Pasko and Gloria Mensik Sprincz, defendants-appellants.

Albert E. Jenner, Jr., Charles J. O'Laughlin, Thomas L. Eovaldi, Raymond, Mayer, Jenner & Block, Seymour I. Burton, Chicago, Ill., City Savings Ass'n, Louis Kwasman, Harry Hartman and Dennis Kirby, defendants-appellants.

William G. Clark, Atty. Gen. for State of Illinois, Richard A. Michael, John J. O'Toole, Stuart D. Perlman, Asst. Attys. Gen., Chicago, Ill., Joseph E. Knight and Justin Hulman, defendants-appellants.

Arnold I. Shure, Solomon Jesmer, A. Bradley Eben, Robert A. Sprecher, Chicago, Ill., for appellees.

Philip A. Loomis, Jr., David Ferber, Securities & Exchange Commission, Washington, D. C., Edward B. Wagner,

Sp. Counsel, Richard E. Nathan, Atty., Securities and Exchange Commission, Washington, D. C., amici curiae.

Before KNOCH, KILEY and CUMMINGS, Circuit Judges.

KNOCH, Circuit Judge.

The City Savings Association, an Illinois savings and loan association is now in process of voluntary liquidation. When this Complaint was filed in the United States District Court, the Association was in the custody of the defendant, Joseph E. Knight, Director of Financial Institutions of the State of Illinois. He had assumed custody on June 26, 1964, under authority of the Illinois Savings and Loan Act, Illinois Revised Statutes, Chapter 32, § 848. The defendant Justin Hulman is the Supervisor of the Savings and Loan Division of the Department of Financial Institutions.

At a special meeting on July 28, 1964, the shareholders of City Savings approved a plan of voluntary liquidation and elected the defendants Louis Kwasman, Harry Hartman and Dennis Kirby liquidators to carry out the plan which was approved by the Department of Financial Institutions as evidenced by a certificate filed with the Cook County Recorder of Deeds on August 7, 1964, at which time the plan became effective.

Meanwhile, on July 24, 1964, this action was filed by the plaintiffs-appellees, Alexander Tcherepnin, Ming Tcherepnin, et al., who describe themselves as purchasers, at various dates, of securities issued by City Savings, consisting of capital shares of and a capital interest in City Savings.

Under the Illinois Savings and Loan Act, Illinois Revised Statutes, Chapter 32, §§ 701–944, an association unable to meet its cash commitments could limit the amount of cash a depositor might withdraw [§ 773(b)] as City Savings did in 1958. It was then prohibited from accepting new deposits. The Act was amended on July 9, 1959 [§ 773(h)] to allow acceptance of new deposits on which it was prohibited to place limitations of withdrawal.

The accounts represented by the plaintiffs according to the Complaint were all opened under the 1959 amendments and hence are fully withdrawable despite the conclusory assertions in the Complaint that plaintiffs purchased their shares on a restricted withdrawal basis.

The plaintiffs brought this action for themselves and all other persons who made deposits in City Savings since July 23, 1959, to have their purchases of shares declared void and to be declared creditors of City Savings.

They invoked jurisdiction of the District Court under § 27 of the Securities Exchange Act of 1934 (Title 15, U.S.C. § 78aa). Diversity of citizenship is lacking here. In addition to those noted above, the Complaint lists as defendants: the City Savings Association, and certain of its former officers and directors.

The Securities and Exchange Commission was allowed to intervene as amicus curiae. A group purporting to represent other depositors was allowed to enter the case as party-defendants.

The Complaint alleged that in making their deposits the plaintiffs relied on false and misleading solicitations mailed to them in violation of § 10(b) of the Securities Exchange Act of 1934, and of the General Rules and Regulations promulgated thereunder, which rendered their purchases void under § 29(b) of the Act entitling them to rescind their investments and to recover the amount of their investments plus interest.

The defendants City Savings and the three liquidators moved to dismiss the Complaint for lack of jurisdiction in the District Court because the subjects of the action—withdrawable capital accounts of a state-chartered savings and loan association—were not "securities" within the meaning of the Act. The other defendants also moved to dismiss the action. All the motions were denied.

The question presented by denial of motion to dismiss was certified by the District Court under § 1292(b) of the Judicial Code (Title 28 U.S.C. § 1292(b)). This Court granted petition for leave to file interlocutory appeal.

We are thus presented with one contested issue: is a withdrawable capital account in an Illinois-chartered savings and loan association a "security" within the meaning of that term as it is used in the Securities Exchange Act of 1934?

The plaintiffs-appellees and the Securities and Exchange Commission, which has filed its brief in these cases as amicus curiae, both assure us that a withdrawable capital account in an Illinois-chartered savings and loan association is such a "security"; that Congress intended to include such accounts within the broad definition of the Act, particularly as shown by subsequent amendments. They also point to court decisions classifying as "securities" some interests which possess some similar characteristics, which they view as the fundamental characteristics of these accounts. On the other hand, they see the other rather strikingly distinctive characteristics of these accounts, on which the appellants rely, as not fundamental but as merely subsidiary, some of even these being also present in other interests which have been accepted as securities.

The Act provides the following definition of a "security":

"The term 'security' means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." Securities Exchange Act of 1934, § 3(a) (10), 15 U.S.C. § 78c(a) (10)

The type of interest now before us, if it is covered by this definition, must be an "instrument commonly known as a 'security'."

The report accompanying the predecessor Act, cited as the Securities Act of 1933, noted that the term "security" was so defined as to include the many types of instruments which in the commercial world fell within the "ordinary concept of a security." H.R.Rep. No. 85, 73rd Cong., 1st Sess. 5/4/33 p. 11.

As appellants state, these accounts are unlike the ordinary concept of a security in such characteristics as being permissibly issued in unlimited amounts; as not made subject to the securities article of the Uniform Commercial Code; as not negotiable and transferable only by assignment; as subject to forced redemption and retirement on call of the board of directors; as fully matured and withdrawable when issued; as without pre-emptive rights; as evidenced by an account book, the holders of which are not entitled to inspect the general books and records of the association; although entitled to vote for directors, to give a proxy which may (and usually does) provide that it is irrevocable, and which is typically executed when the account is opened, and to receive dividends.

The Illinois statutes which created withdrawable accounts in savings and loan associations show clearly that the Illinois legislature did not intend them to be securities. It thus seems difficult to assert that these interests can be "commonly known as a security."

According to its preamble, the Securities Exchange Act is designed to regulate transactions in securities as commonly conducted on securities exchanges and over-the-counter markets, the price of such securities being susceptible to manipulation and control and the dissemination of such prices giving rise to excessive speculation resulting in sudden and unreasonable fluctuations in the prices of securities.

The 1934 Act expressly excludes debtor-creditor relationships represented by notes maturing in nine months of issuance. The interest with which we are concerned is mature at issue.

The Federal Bankruptcy Act, Title 11 U.S.C. § 22, exempts State building and loan associations from federal bankruptcy adjudication. See Security Building & Loan Ass'n v. Spurlock, 9 Cir., 1933, 65 F.2d 768, 771, where the Court quotes extensively with approval from Rep. 98, 72d Congress, 1st sess. House Judiciary Committee; House Reports 2–659, 72d Cong. 1st sess., indicating Congressional determination to leave the administration of State created building and loan associations in the local courts. We may assume that City Savings would be exempt from the provisions of the Bankruptcy Act. Home Savings and Loan Ass'n v. Plass, 9 Cir., 1932, 57 F.2d 117.

In S.E.C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 352–353, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943), the Court was considering whether assignments of oil leases were securities under the Act. In that connection the Court said:

> The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.

At another point (320 U.S. p. 351, 64 S.Ct. p. 123) the Court said:

> [T]he term "security" was defined to include * * * documents in which there is common trading for speculation or investment.

In S.E.C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) the Court said:

> The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.

An "investor" in a savings and loan association lends his money to be withdrawable at will and to earn interest. The relationship with the enterprise is much more that of debtor-creditor than investment. The profit is derived from loans to other members of the savings and loan association. This is not investment in a common enterprise with profits to come solely from the efforts of others.

The Securities Act of 1933 and the Securities Exchange Act of 1934 were passed in the aftermath of the great economic disaster of 1929. Congress was concerned with speculation in securities which had a fluctuating value and which were traded in securities exchanges or in over-the-counter markets.

The S.E.C. relies heavily on a recent amendment. Section 12(g), Title 15 U.S.C. § 78l(g), provides for registration of certain equity securities. There is a specific exemption of "any security [with certain exceptions not pertinent here] issued by a savings and loan association" § 12(g) (2) (C). The S.E.C. thus argues that the definition of "security", supra, must include interests which are referred to as securities in this exemption.

If these interests were already excluded by the definition, the Commission argues, then the exemption would be meaningless or would have to be interpreted as referring to some other undefined security of a savings and loan association.

In its Technical Statement on H.R. 6789, H.R. 6793, and S. 1642, submitted at the Hearings before a Subcommittee of the Committee on Interstate and Foreign Commerce; House of Representatives, 88th Congress, 1st Session (1963), p. 215, the S.E.C., while referring to all other interests which it recommended for exemption as being "securities", speaks of "share accounts" when referring to the savings and loan associations, suggesting that a distinctive view was held of these interests by the Commission itself.

The S.E.C. sees no significance in the omitting from the definition in the 1934 Act of the term "evidence of indebtedness" which does appear in the definition in the 1933 Act. These Acts were considered to have been substantially the same. The S.E.C. sees the omission as merely indicative of a different draftsman.

The Commission also notes that there was apparently no discussion of savings and loan interests at the time the 1934 Act was passed.

However, appellants invite our attention to the lengthy consideration of the term "evidence of indebtedness" in connection with the 1933 Act. (Hearings on S. 875 before Senate Committee on Banking and Currency, 73rd Cong. 1st sess., pp. 94–120 passim.)

Some of the Senators evidently saw a relationship between this term "evidence of indebtedness" and accounts in building and loan associations as well as between the term and various short term banking transactions. There was some fear that the 1933 Act would interfere with ordinary commercial banking transactions. The term was retained but certain short-term debtor-creditor transactions were exempted. The same Congress which in 1933 had been considering the relationship between the term "evidence of indebtedness" and accounts in building and loan associations, excluded that term from the 1934 Act, retaining only such evidences of indebtedness as long-term notes, bonds and debentures. Yet the Investment Act of 1940, Title 15 U.S.C. § 80a–2(a) (35), for example, retains the term in its definition of "security". Congress must have had some intention of excluding those interests which fell under the broad character of "evidence of indebtedness."

The definitions set out in the Act are all preceded by an introductory statement that they apply "unless the context otherwise requires."

Perhaps insurance policies may provide a useful analogy. In discussing mutual insurance companies over whom the S.E.C. does not claim jurisdiction, Chairman William L. Cary of the S.E.C. said:

[W]e do say that mutual insurance companies are not included under this bill because the buyers in mutual insurance companies are fundamentally buying insurance. * * * and not stock. Furthermore, because there is no stock, there is no trading in the

stock. (House Hearings, 1963, supra, p. 309.)

Basically that distinction applies to holders of "share accounts" in savings and loan associations. There is no stock or trading in stock.

A little later, Chairman Cary said:

[S]ince the holders in mutual companies are policy holders, any wrongdoing would be the responsibility of the State superintendent of insurance.

With respect to City Savings, also, the local State authorities are ready and able to handle the orderly disposition of the institution's liquidation.

Insurance policies were exempted from the Securities Act of 1933 [Title 15 U. S.C. § 77c(a) (8)] and under the 1964 amendments [Title 15 U.S.C. § 78l(g) (2) (G)]. Are they necessarily included in the definition of "securities"?

Professor Loss (Securities Regulation, 2d. ed. 1961, p. 497) says that on its face the exemption of insurance policies in the 1933 Act seems to create a negative implication that insurance policies are securities which may be exempt from registration but are subject to the anti-fraud provisions. He observes that the Commission takes the position with respect to insurance policies that they are not intended to be "securities".

Chairman Cary advised, in the course of the Hearings before the Subcommittee in 1963, supra, p. 300, that while his Commission regulated offering of variable annuities as an offering of securities subject to the 1933 Act, he wanted to emphasize the fact that it was only the investment company operation that was regulated; that "we don't touch the insurance operations that they may have."

Professor Loss also notes that the House Report states that the purpose of the exemption is to make clear what was implied in the Act, that insurance policies are not to be regarded as securities subject to the provisions of the Act. See H. R. Rept. 85, 73rd Cong., 1st sess. (1933) 15, cited in S.E.C. v. Variable Annuity Life Ins. Co., 359 U.S. 65, 74, n. 4, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959) in Jus-

tice Brennan's concurring opinion, where he states that under the Securities Act of 1933, it would appear that for ordinary insurance policies the exemption is just confirmatory of the policy's non-coverage under the definition of security.

H.R. Rept. 85 states that:

The entire tenor of the act would lead, even without this specific exemption, to the exclusion of insurance policies from the provisions of the act, but the specific exemption is included to make misinterpretation impossible.

It seems likely that the specific exemption of the interest here under consideration was also inserted for the same reason. This seems a more reasonable interpretation than that urged on us by the appellees and the Commission.

The appellees and the Commission cite a number of cases from which we are invited to draw analogies favorable to their view. However, these deal largely with the 1933 Act which included the broad term "evidence of indebtedness" which, as indicated, was excluded from the 1934 Act with which we are here concerned, or which are otherwise not directly helpful. Neither the parties nor this Court has found a case directly in point.

We have carefully considered all other arguments advanced and have studied all authorities cited. It is our opinion that these interests are not encompassed in the definition of a "security" under the 1934 Act; that the anti-fraud provisions of that Act are not here applicable; and that the District Court lacked jurisdiction of this cause.

The decision of the District Court is therefore reversed and the cause is remanded with instructions to dismiss the Complaint.

*Reversed and remanded with instructions.*

CUMMINGS, Circuit Judge (dissenting).

My conclusion is that Chief Judge Campbell of the District Court correctly held that withdrawable capital shares [1] in Illinois savings and loan associations are "securities" within the meaning of Section 3(a) (10) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a) (10)), so that the anti-fraud provisions of that statute are applicable to this case. Savings and loan passbooks typically describe the owners as holding a savings account representing *"share interests"* in the association. Many associations reserve the right to require 30 days' notice for withdrawals. Insurance, when available through the Federal Savings and Loan Insurance Corporation, gives $15,-000 maximum coverage up to the "full withdrawal or repurchasable value of the accounts of each of its * * * investors * * * holding withdrawable or repurchasable *shares"* (12 U.S.C. § 1728(a)). (Italics supplied.)

Section 3(a) (10) is quoted in the majority opinion and defines "security" as including, *inter alia,* any "stock * * * certificate of interest or participation in any profit-sharing agreement * * * transferable share, [or] investment contract". This definition is substantially the same as that contained in Section 2 (1) of the Securities Act of 1933 (15 U.S.C. § 77b(1)), so that the legislative history and judicial construction of the definition in the Securities Act lend meaning to the definition in the complementary 1934 Act.

In enacting the Securities Act of 1933, Congress exempted "any *security* issued by a * * * savings and loan association" from the registration provisions while subjecting them to the fraud provisions of that statute (15 U.S.C. §§ 77c (a) (5)) and 77q(a) and (c)). (Italics supplied) While the savings and loan industry representatives were desirous of an exemption from the registration pro-

---

1. *Arguendo,* the majority and this dissenting opinion consider these as withdrawable shares in accordance with the then applicable provisions of the Illinois Savings and Loan Act (Ill.Rev.Stat., 1963, c. 32 § 773(h)). However, the complaint alleges that since 1959 the shares were sold on a restricted withdrawal basis. At trial, the District Court would have to determine whether defendants could sell shares restricted against withdrawal. That point has not been considered in this Court.

visions of the 1933 Act, their spokesman, the late Morton Bodfish, supported the application of the anti-fraud provisions of the statute to the issuance of savings and loan shares, which he described *passim* as securities.[2] This specific exemption shows that when Congress wished to exclude savings and loan accounts, it knew how to do so. It has never chosen to exclude them from the anti-fraud requirements of the 1934 Act. The majority opinion relies on the securities exemption of ordinary insurance policies under the 1933 Act, but they differ from withdrawable capital accounts because they possess none of the attributes of securities. As Professor Loss observes, the exemption of insurance policies was supererogation due to an excess of caution. 1 Loss, *Securities Regulation* (2d ed 1961) pp. 496–497. Therefore their exemption does not show they are subject to the anti-fraud requirements of the 1933 Act, particularly since the 1933 legislative history shows that they were "not to be regarded as securities" (idem).

When Congress enacted the Securities Exchange Act of 1934, there was no discussion of savings and loan interests during the consideration of the definition of a security in that Act.[3] However, in 1964, in amending the 1934 Act by providing for the registration of equity securities by certain issuers, Congress exempted "any *security* * * * issued by a savings and loan association" from the new registration provisions (15 U.S. C. § 78*l*(g) (2) (C)). (Italics supplied) The then Chairman of the Securities and Exchange Commission, William L. Cary, explained the exemption as follows:

> "Because of the fact that most savings and loan associations issue so-called shares, which in fact merely evidence the existence of a savings account, special provision had to be made to exempt that type of 'share' ".[4]

No exemption would have been necessary unless shares in savings and loan associations were already within the definition of a security under Section 3(a) (10) of the Securities Exchange Act. This exemption was justified in the Senate Report on the ground that "There is normally no trading interest in the remaining *categories of securities* [including share accounts in savings and loan associations] exempted from the registration provisions." S.Rep. No. 379, 88 Cong., 1st Sess., p. 61 (1963). (Italics supplied) Thus the Senate Committee on Banking and Currency understood such share accounts to be "securities."

The definition of a "security" in the Securities Act of 1933 was involved in Security and Exchange Commission v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244. The Court said that the term security "embodies a flexible rather than a static principle" in order to meet the "variable schemes devised by those who seek the use of the money of others on the promise of profits" (328 U.S. at p. 299, 66 S.Ct. at p. 1103). Therefore, it held that a sale of a parcel of land in citrus groves, when coupled with a contract for management services, was an "investment contract" within the definition of a security under the 1933

2. Hearings on H.R. 4314 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 1st Sess., pp. 72–74. See also Hearings on S. 875 before the Senate Committee on Banking and Currency, 73d Cong. 1st Sess. pp. 50–54 (1933); Richards, The Federal Securities Act, Building and Loan Annals (1933), pp. 111, 115–118.

3. There has been no showing that the deletion of "evidence of indebtedness" (found in the "security" definition in the 1933 Act) from the 1934 Act's definition of a security was intended to exempt savings and loan accounts. The author of the 1934 Act may have decided that inclusion of "evidence of indebtedness" would be poor draftsmanship, that term being inconsistent with the exclusion of "any note, draft, bill of exchange, or banker's acceptance" (15 U.S.C. § 78c(a) (10)).

4. Hearings on H.R. 6789, H.R. 6793 and S. 1642 before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 88th Cong., 1st Sess. p. 1213 (1963).

Act. In language applicable here, the Court stated (at pp. 298, 299, 66 S.Ct. at p. 1103):

> "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise."[5]

Here too the shareholders in this Illinois savings and loan association invested their money in a common enterprise and were led to expect profits from the efforts of others, *viz.*, the management. As in *Howey*, it is immaterial whether their shares were evidenced by formal certificates. Whether or not plaintiffs' shares are an "investment contract" under the *Howey* case, the Securities Exchange Act applies if they are "stock", a "transferable share" or a "certificate of interest or participation in any profit-sharing agreement." The subsequent clause in Section 3(a) (10) referring to "in general, any instrument commonly known as a 'security' " is not a limitation upon the preceding categories. Llanos v. United States, 206 F.2d 852, 854 (9th Cir. 1953) certiorari denied, 346 U.S. 923, 74 S.Ct. 310, 98 L.Ed. 417. It must be remembered that these various categories in Section 3(a) (10) are not mutually exclusive and are meant to be "catchalls". 1 Loss, *Securities Regulation*, (2d ed 1961) pp. 483, 488–489. The breadth of the definition of security in the two Acts is shown by Professor Loss' illustrations of coverage in cases involving animals, fishing boats, automobile trailers, vending machines and parking meters, cemetery lots, tung trees, vineyards, fig orchards, farm lands, and patent rights. 1 Loss, *Securities Regulation* (2d ed 1961) pp. 490–491 and 1962 Supplement, p. 30. All sorts of schemes, "many of them of the Alice in Wonderland variety", are regulated through "the *Joiner-Howey* process of looking through form to substance" and through the broad definition of "security" found in the two Acts. Idem, pp. 488–489. Under the definition of a "security" under the 1933 and 1934 Acts, a writing is not essential. 1 Loss, *Securities Regulation* (2d ed 1961) pp. 458, 488–489. Moreover, these passbooks would qualify as writings and indeed as certificates "of interest or participation in any profit-sharing agreement" (15 U. S.C. § 78c(a) (10)).

As observed in a similar context, it is unnecessary to pigeonhole these withdrawable capital shares into one category of security or the other. Cf. Securities and Exchange Commission v. Variable Annuity Life Ins. Co., 359 U.S. 65, 80, 79 S.Ct. 618, 3 L.Ed.2d 640 (concurring opinion). In addition to the *Variable Annuity* and *Howey* cases, Securities and Exchange Commission v. C. M. Joiner Corporation, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88, indicates that these companion statutes must be liberally construed in view of their remedial purpose. There the "investment contract" part of the security definition in the 1933 Act was deemed applicable to non-standard offerings of variable character (320 U.S. at p. 351, 64 S.Ct. 120). Our Court has also favored a broad construction in Securities and Exchange Commission v. Crude Oil Corp., 93 F.2d 844, 846 (7th Cir. 1937); and Securities and Exchange Commission v. Universal Service Ass'n, 106 F.2d 232, 237 (7th Cir. 1939), certiorari denied, 308 U.S. 622, 60 S.Ct. 378, 84 L.Ed. 519.

Although the foregoing cases involved the Securities Act of 1933, the definition of a security in the Securities Exchange Act was involved in Securities and Exchange Commission v. Los Angeles Trust Deed & Mortgage Exchange, 186 F.Supp. 830, 886–888 (S.D.Cal.1960), affirmed in pertinent part, 285 F.2d 162 (9th Cir. 1960), certiorari denied, 366 U.S. 919,

---

5. The broad Howey formula has been codified into a rule under the Illinois "blue sky" statute. 1 Loss, Securities Regulation (2d ed. 1961), pp. 487–488, note 79. Ill.Rev.Stat., 1965, c. 121½, § 137.2–1.

81 S.Ct. 1095, 6 L.Ed.2d 241. In affirming the District Court's holding that defendant's sales of second trust deeds constituted sales of "securities" within the 1933 and 1934 statutes, the Ninth Circuit noted that "Howey adds the test of *common enterprise* to the Joiner test of *results dependent on the efforts of one other than the purchaser*" (285 F.2d at p. 168; court's italics). There the defendant selected a trust deed for the investor and serviced it by making the collections from the grantor-debtor and by doing the bookkeeping. Basically the system was very much like a savings and loan association, for funds supplied by investors were used to finance secured loans on real property. In *Los Angeles Trust Deed*, the investors' money was used to buy a particular deed, whereas savings and loan associations make their loans from commingled savings. This difference satisfies the "common enterprise" *Howey* test even more than the trust deed system in *Los Angeles Trust Deed*. Under that case, the instant plaintiffs' shares clearly represent an "investment contract" within the security definition in the 1934 Act.

In Securities & Exchange Commission v. American International Savings and Loan Ass'n., 199 F.Supp. 341, 346 (D.C. Md.1961), the association's articles provided for preferred stock to be known as preferred share or savings share accounts. Deposit books were issued to depositors, who were entitled to receive cumulative dividends of at least 3½% before any dividends were paid to common stockholders. Since the court held that defendants violated the 1933 Act, it necessarily concluded that this preferred stock, which resembled withdrawable capital shares in the City Savings Association, was a security within the purview of the 1933 Act.[6] Applying *American International* here would mean that these shares qualify as securities under the like definition in the 1934 Act.

A recent Illinois decision involving a savings and loan association also shows that these withdrawable shares are "securities". Thus in Marshall Savings and Loan Association v. Henson, 222 N.E.2d 255 (1966), the Appellate Court of Illinois observed "that the Illinois Savings and Loan Act gives the depositors the status of *shareholders* by conferring one vote for each $100 on deposit" (italics supplied). There it was held that the Federal Savings and Loan Insurance Corporation, as assignee of Marshall's withdrawable share accounts, had obtained the right to vote the "stock" or "shares" even though Marshall's members had not endorsed their certificates or passbooks to the Federal Savings and Loan Insurance Corporation. Similarly, Wisconsin Bankers Association v. Robertson, 111 U.S.App.D.C. 85, 294 F.2d 714 (1961), certiorari denied, 368 U.S. 938, 82 S.Ct. 381, 7 L.Ed.2d 338 concluded that the holder of a savings account in a savings and loan association was a shareholder and not a creditor of the association, and that such associations were not banks. The concurring opinion of Judge Burger noted that the owner of a savings and loan association account is an investor and is entitled to vote for management. See also Aetna Casualty & Surety Company v. Porter, 111 U.S.App.D.C. 267, 296 F.2d 389 (1961), reversed on other grounds, 370 U.S. 159, 82 S.Ct. 1231, 8 L.Ed.2d 407. As further evidence of the distinction between savings and loan associations and banks, we have been advised that as of December 31, 1965, the mortgage loans of savings and loan associations were 85.14% of their total assets, whereas the comparable percentage for commercial banks was only 13.11%. Banks are in a much more liquid position than those associations, demonstrating that investors in such associations need the disclosures required under the 1934 Act.

The majority opinion and the defendants reason that these withdrawable cap-

---

6. In United States v. Hopps, 215 F.Supp. 734, 754 (D.Md.1962), affirmed 331 F.2d 332 (4th Cir. 1964), certiorari denied, 379 U.S. 820, 85 S.Ct. 39, 13 L.Ed.2d 31, the same judge described interests in savings and loan associations as "securities".

ital accounts form a "debtor-creditor relationship" and are not investments. This reasoning is contrary to Section 4–13(f) of the Illinois Savings and Loan Act (Ill.Rev.Stat., 1965, c. 32 § 773(f)), which provides:

> "The holder of withdrawable capital for which application for withdrawal has been made, does not become a creditor by reason of such application."

Both the *Wisconsin Bankers* and *Aetna Casualty* cases also hold that a creditor-debtor relationship is not present here. If these shareholders were creditors, they would be entitled to interest. Actually they are entitled to receive only dividends payable out of the association's profits, if any.

To avoid the security definition, appellants emphasize the withdrawability and non-preemptive rights attached to these savings and loan shares, but the same is true of mutual fund shares. They are of course "securities" subject to the anti-fraud provisions of the 1933 and 1934 Acts. Also in truth these savings and loan shares are less "withdrawable" than stocks which can be sold immediately merely by phoning a broker. As to savings and loan shares, the investor may have to wait 30 days or more for withdrawals, and the association may limit the amount of withdrawals (Ill.Rev.Stats. (1965) c. 32 § 773(a) and (b)). If as here, the association has suffered reverses, withdrawability is an empty right. Also, these shareholders' right of redemption and their right to vote for directors, to participate in dividends, and to obtain a certificate of ownership are all common characteristics of securities. It is immaterial that they had no right to inspect City Savings' books and records. Neither do bondholders or holders of such interests as involved in *Howey*, and yet the 1934 Act applies to those categories.

Defendants and the majority opinion assert that these savings and loan interests are not securities because the Illinois Savings and Loan Act provides that they are not subject to Article 8 of the Uniform Commercial Code (Ill.Rev.Stat., 1965, c. 32 § 768(c)). However, if the Illinois Legislature did not consider these accounts to be securities, there would have been no need to exclude them from the Uniform Commercial Code. The comment on Article 8 of the Uniform Commercial Code recognizes that the definition of security contained in Article 8 is less broad than the Securities Act of 1933, the Securities Exchange Act of 1934, and the Illinois Securities Law of 1953. (See Uniform Commercial Code, Illinois comment, Smith-Hurd Ill. Stats. Ann., c. 26 § 8–102.) It is significant that the Illinois Securities Act of 1953 recognizes withdrawable capital share accounts as securities. Thus that Act affords an exemption to "the following securities: * * * Securities issued by * * * any savings and loan association * * *" (Ill.Rev.Stats., 1965, c. 121½, § 137.3, subd. D).

The majority opinion and the defendants also rely on the short-term commercial paper exclusion in the definition of "security" in Section 3(a) (10) of the Securities Exchange Act for "currency or any note, draft, bill of exchange, or banker's acceptance" having a maturity not exceeding nine months at issuance. Plaintiffs' interests in City Savings are neither currency nor short-term commercial paper of non-investment character and therefore do not fall within this exclusion. Finally, in this connection, Section 4–13(f) of the Illinois Savings and Loan Act (Ill.Rev.Stat., 1965, c. 32 § 773 (f)), providing that a holder of withdrawable capital does not become a creditor even upon filing an application for withdrawal, rebuts any arguments that plaintiffs' interests were short-term debts within the commercial paper exclusion.

Defendants and the majority opinion point to the savings and loan association exemption in the Federal Bankruptcy Act (11 U.S.C. § 22) in an effort to show that Congress intended to exempt such associations from all federal regulation. But railroads, for example, are also exempted from the Bankruptcy Act, and of course their securities are subject to the Securities Act and the Securities Ex-

change Act. The exemption of an association from one federal Act certainly does not show that it is to be exempted from the scope of other federal Acts.

The opponents of federal regulation emphasize the non-marketability of these shares, but the scope of the 1934 Act is of course not limited to securities traded on markets. Schine v. Schine, 250 F. Supp. 822, 823 (S.D.N.Y.1966) and cases cited. These shares were transferable,[7] and at the oral argument it was undenied that such shares have been traded over-the-counter. The preamble of the Securities Exchange Act covers the regulation of over-the-counter markets (H.R. 9323, Public No. 291, 73d Cong., 1st Sess. (1934)), and Section 10(b) of the Act reaches manipulative or deceptive devices or contrivances employed in connection with the purchase or sale of any security not registered on a national exchange (15 U.S.C. § 78j(b)). Because shares in savings and loan associations are sold on over-the-counter markets, the SEC has required the registration of brokers who deal solely in such shares. In any case, the oil leases, orange groves and variable annuity policies involved in the Supreme Court's *Joiner, Howey* and *Variable Annuity* cases were not traded on exchanges or over the counter, and yet all were held to be securities even though they had none of the ordinary characteristics of securities described in the present majority opinion. Also, none of those cases relied on "evidence of indebtedness" as found in the 1933 Act's security definition. Hence the absence of that term from the otherwise similar definition in the 1934 Act does not show that the other terms in the 1934 definition must be given a narrower construction. In that trio of leading cases, it was much more difficult to justify applicability of the federal statute than here, for there was seemingly a strong Congressional policy against federal regulation, less need for investor protection and less statutory support. Here, as seen, the savings and loan industry welcomed the federal anti-fraud umbrella, the investors need federal protection, and the 1934 statutory definitions of a security are clearly broad enough to cover these shares.

Policy considerations also require affirmance of the decision below. The typical savings and loan account-holder is a small investor, as unwary and in need of protection as a typical, unsophisticated holder of corporate stock. Protection is especially warranted here, for compliance with rules and regulations under Section 10(b) of the 1934 Act (15 U.S.C. § 78j(b)) would not involve any excessive burden on these associations, nor is there any undue intrusion on State regulation. In fact, the briefs of the Illinois Attorney General point to no comparable Illinois statutory protection and do not show as a matter of federal-state relations why the 1934 Act should not be applied.

Defendants assert that the federal anti-fraud provisions were meant to inhibit artificial price levels of shares and that these shares do not fluctuate in price. However, the shares here do fluctuate in value. If the association is successful, the investors' holdings are worth more than the price paid. If, as here, the association is unsuccessful, the shares become worth very little. It is the fluctuation in value of their shares that is important to these shareholders. Even though not always a panacea, the use of the federal anti-fraud provisions would help to guard against circumstances that would plummet the share value downwards.

The investors in City Savings were less able to protect themselves than the purchasers of orange groves in *Howey*. These plaintiffs had to rely completely on City Savings' management to choose suitable properties on which to make mortgage loans. Cf. Penfield Co. of California v. Security and Exchange Commission, 143 F.2d 746, 751, 154 A.L.R. 1027 (9th Cir. 1944) certiorari denied, 323 U.S. 768, 65 S.Ct. 121, 89 L.Ed. 614. The members of City Savings were widely scattered. Many of them probably invested in City Savings on the ground that their money would be safer than in

---

7. Section 4–8(b) of the Illinois Savings and Loan Act (Ill.Rev.Stat. (1965), c. 32 § 768(b)).

stocks. They doubtless expected insurance through the Federal Savings and Loan Insurance Corporation or other sources. Through SEC regulation helpful information would be available to these investors. Through disclosure, they would have learned that City Savings was financially embarrassed and on a limited withdrawal basis, that it had been unable to obtain federal insurance for its shareholders, that its one-year Morocco insurance had not been renewed, and that C. Oran Mensik, (whose management had been criticized by the Federal Savings and Loan Insurance Corporation) was connected with City Savings. Instead, City Savings was enabled to speak of its financial strength and to advance reasons why investors should purchase shares therein. Because savings and loan associations are constantly seeking investors through advertising (see, e. g., New Year's Savings & Loan Association Supplement, *Chicago Tribune*, December 27, 1966), the SEC's present tender of its expert services should be especially beneficial to would-be savings and loan investors as a shield against unscrupulous or unqualified promoters. Nothing in the 1934 Act or the cases under the two Acts stands in the way of such anti-fraud protection. The District Court was clearly correct in affording it.