Alexander TCHEREPNIN et al.,
Plaintiffs,

v.

Robert FRANZ et al., Defendants.

No. 64 C 1285.

United States District Court,
N. D. Illinois.

April 14, 1975.

Steven L. Bashwiner, Don. H. Reuben, Kirkland & Ellis, Chicago, Ill., for cross-plaintiff (Receiver for City Savings Assn.).

John F. Schlafly, Alton, Ill., Raymond F. McNally, Jr., St. Louis, Mo., for cross-defendant Estate of Knight.

## MEMORANDUM AND ORDER

ROBSON, Chief Judge.

This matter comes before the court on the motion of cross-plaintiff City Savings Association (City Savings), by its receiver Samuel Berke, and pursuant to Rule 56 of the Federal Rules of Civil Procedure for entry of summary judgment on Counts I, II and III of its Amended First Cross-Complaint against cross-defendant First National Bank & Trust Company of Alton, Illinois, executor of the estate of Joseph E. Knight (Estate of Knight). In addition, the Estate of Knight has moved to dismiss Counts I, II and III of the Amended First Cross-Complaint. Cross-defendant Justin Hulman has joined in the motion to dismiss and has adopted the Estate of Knight's memorandum in support thereof. For the reasons set forth below, the motions to dismiss shall be denied and the receiver's motion for summary judgment shall be granted as to Counts I and II and denied as to Count III.

This complex and protracted litigation involves the events surrounding the collapse of City Savings Association, a savings and loan association chartered by the State of Illinois and presently under the control of federal receivers. The history of City Savings and its mentor, C. Oran Mensik, is a chronicle of political intrigue and corruption perhaps unmatched in Illinois history. It is replete with examples of official misconduct and chicanery and permeated with a blatant disregard by both state and City Savings officials for the rights of the unfortunate depositors. The result of these defalcations was a massive fraud which milked the depositors of nearly $23,000,000.

To fully comprehend the allegations made in the Amended First Cross-Complaint, the history of City Savings and of this litigation must first be reviewed in some detail.

### Events Prior to the Commencement of This Litigation

City Savings Association was founded in 1908 in Chicago, Illinois. It issued to its depositors withdrawable capital shares, as authorized by the Illinois Savings and Loan Act, Ill.Rev.Stat.1963, ch. 32, §§ 701–944. City Savings was located in and serviced an area known as the Chicago-Ashland business district, a focal point for various Chicago ethnic groups. The Failure of the City Savings Association, a report to the Illinois General Assembly, Illinois Legislative Investigating Commission, January, 1972 (hereinafter referred to as Legislative Report), p. 1.

In 1942, C. Oran Mensik, the principal manipulator of this fraud, first became associated with City Savings. Mensik's emergence as president and director of City Savings, six months later, marked the beginning of an astounding period of economic growth. When Mensik joined City Savings there were 348 shareholders and $147,000 in assets. By 1952, the reported assets of City Savings had reached $12,000,000 and in the next five years this figure climbed to over $35,000,000. Mensik remained in control of City Savings until at least 1964. Legislative Report, p. 1.

On July 18, 1956, the Auditor of Public Accounts for the State of Illinois, the public official then charged with the supervision of state-chartered savings and loan associations, ordered state examiners to conduct an examination of the books and records of City Savings. Subsequent examinations were made in October 1956 and February 1957. The last examination report was sent to the management of City Savings on April 16, 1957, and was accompanied by a letter from the Auditor outlining the State's criticisms and recommendations. On April 23, these examinations were released to the press. The resulting publicity caused a run on City Savings. On April 25, 1957, the Auditor declared an "emergency," took custody of City Savings and closed its doors to the public. Ill.Rev.Stat.1955, ch. 32, § 848; Legislative Report, pp. 3–8.

The examination findings upon which the Auditor relied revealed: that the capital of City Savings was severely impaired; that certain favored companies staffed and operated by Mensik's associates and relatives had received a disproportionate amount of mortgage loans; that properties securing mortgage loans were greatly overappraised; and that Mensik was involved in two other guarantee associations which were both in financial straits. Legislative Report, p. 7.

In response, Mensik filed suit in the Circuit Court of Cook County charging that the Auditor and five of his associates were engaged in a conspiracy to "steal" Mensik's associations from him. The matter was referred to Nathan M. Cohen as Master in Chancery. After an extensive hearing, the Master concluded that the responsibility for the emergency was chargeable to the Auditor because of his untimely release of the confidential report and that the state seizure was therefore illegal. On December 6, 1957, Judge Cornelius Harrington adopted the Master's findings and ordered that control of City Savings be returned to Mensik. This decision was ultimately affirmed by the Supreme Court of Illinois in 1960. Mensik v. Smith, 18 Ill.2d 572, 166 N.E.2d 265 (1960).

Judge Harrington, however, also found that some of the criticisms registered by the Auditor were valid and retained supervisory jurisdiction over City Savings to oversee the implementation of certain suggested remedial measures. One of these suggestions was the institution of a system of limited and restricted withdrawals pursuant to Section 773(b) of the Illinois Savings and Loan

Act, Ill.Rev.Stat.1963, ch. 32, § 773(b). Legislative Report, pp. 8–11.

On December 19, 1957, City Savings was reopened to the public. On February 3, 1959, Judge Harrington determined that the conditions which the court directed to be remedied had been in fact corrected and terminated all judicial supervision of City Savings. Legislative Report, p. 11.

The rapid growth experienced by City Savings prior to its 1957 closing declined sharply due both to the damaging publicity it had received and to its decision to operate under the provisions of Section 773(b). Legislative Report, p. 14.

On July 9, 1959, the Illinois General Assembly enacted Section 773(h) of the Illinois Savings and Loan Act. Ill.Rev. Stat.1959, ch. 32, § 773(h). It provided:

(h) An association while operating under this Section may accept additional withdrawable capital from its present shareholders as well as accept new withdrawable capital accounts and such withdrawable capital accounts shall not be subject to the provisions of subsection (b) of this section but shall be subject to withdrawal at will so long as the association is operating under the provisions of subsection (b) of this section.[1]

Mensik seized the unique advantages offered by this new law and embarked on an extensive advertising campaign, offering expensive prizes such as television sets and radios to new depositors. He also blazoned the maxim "Under State Government Supervision" on his letterheads and circulars. Legislative Report, p. 14.

In January 1964, the State Department of Financial Institutions, to whom supervisory authority over state-chartered savings and loan associations had been transferred, began an examination of the affairs of City Savings. The examination included an audit by Peat, Marwick, Mitchell & Co., independent public accountants, whose report dated June 15, 1964, showed a capital impairment of approximately $14,000,000. Tcherepnin v. Franz, 316 F.Supp. 714 (N.D.Ill.1970). On June 26, 1964, the State of Illinois took custody of City Savings and on June 30, 1964, City Savings was closed to the public. Legislative Report, pp. 14–17.

On July 28, 1964, a meeting of the depositors of City Savings was held at which a plan of voluntary liquidation, agreed upon between Mensik and the State of Illinois, was put forward and approved by the depositors. Pursuant to the plan, three voluntary liquidators were appointed, one nominated by Mensik and the other two by the State of Illinois. Legislative Report, pp. 17–18.

### The Federal Litigation

On July 24, 1964, four days prior to the depositors' meeting called to solicit approval of the plan of voluntary liquidation, the plaintiffs' complaint was filed by Alexander Tcherepnin and certain other holders of withdrawable capital shares of City Savings. Their complaint named Joseph E. Knight, then Director of the Department of Financial Institutions of the State of Illinois; Justin Hulman, then Supervisor of the Savings and Loan Division of the Department; certain officers and directors of City Savings; and Louis Kwasman, Harry Hartman and Dennis Kirby, the voluntary liquidators of City Savings, as parties defendant. Defendants Hartman and Kirby were savings and loan examiners and employees of the Department of Financial Institutions; Kwasman was a business associate and nominee of Mensik.

Plaintiffs alleged in their complaint that their withdrawable capital shares in

---

1. The Legislative Report concluded that there was "no satisfactory explanation for its [Section 773(h)] resurrection at precisely the time it became vital to Mensik's oper-ations, for there was no other savings and loan in the State of Illinois which stood to benefit from its re-enactment." Legislative Report, p. 13.

City Savings were securities within the purview of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., and were purchased in reliance upon false and misleading solicitations made in violation of that act. The plaintiffs sought rescission of their purchases and recovery of their investment.

No wrongdoing was alleged by, and no relief was sought against, the named state officials or the State of Illinois. Nonetheless, on November 20, 1964, the Attorney General of the State of Illinois moved to strike and dismiss the complaint.

On January 17, 1966, Judge Campbell, before whom the matter was then pending,[2] denied all motions to dismiss plaintiffs' complaint and held that plaintiffs owned "securities" as defined by federal law, and certified his ruling for an interlocutory appeal. Tcherepnin v. Franz, 277 F.Supp. 472 (N.D.Ill.1966).

On January 20, 1967, the United States Court of Appeals for the Seventh Circuit reversed Judge Campbell's order and, with one Judge dissenting, held that the plaintiffs were not in fact holders of "securities." Tcherepnin v. Knight, 371 F.2d 374 (7th Cir. 1967).

On December 18, 1967, the United States Supreme Court reversed the order of the court of appeals and held that plaintiffs' withdrawable capital shares were "securities" within the meaning of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). The matter was remanded to this court for further proceedings.

On February 9, 1966, the plaintiffs first moved for the appointment of a receiver to replace the state-supervised voluntary liquidators. Judge Campbell denied this motion but indicated that he would reconsider his decision after appellate review of his order sustaining plaintiffs' complaint. Tcherepnin v. Franz, 277 F.Supp. 472 (N.D.Ill.1966).

On May 29, 1968, upon remand from the Supreme Court, plaintiffs renewed their motion for the appointment of a receiver. From August 19, 1968, to August 23, 1968, a full hearing on the motion was held.

On September 7, 1968, Judge Campbell entered an order appointing Leonard B. Ettelson and William J. Friedman receivers of City Savings.[3] In this order Judge Campbell found that the state-supervised plan of voluntary liquidation was:

. . . tainted with fraud. . . . No reasonable person could have concluded, and I specifically find that Justin Hulman did not believe on June 15, 1964, that the liquidation of City Savings Association . . . could ever result in anything but an enormous loss to the depositors. Nevertheless, the State, while in custody of City Savings Association, allowed C. Oran Mensik . . . to call a meeting of the shareholders [fraudulently] soliciting proxies. . . . Commissioner Hulman was aware of these misrepresentations before, during and after the fact and at no time did he prevent or correct these lies although he had the power and duty to do so.

. . .

I find and conclude that the representations made to the shareholders of City Savings Association were false, misleading and deceptive. . . . I therefore hold the voluntary liquidation is void because it was tainted with fraud from its inception.

---

2. This case was originally assigned to the late Judge Michael Igoe. The matter was reassigned to then Chief Judge William J. Campbell in 1965. After extensive proceedings before Judge Campbell and his taking senior status on August 29, 1972, the Executive Committee of this court reassigned this case to myself.

3. Leonard B. Ettelson and William J. Friedman ably served as receivers of City Savings from September 7, 1968, until their resignation on March 27, 1973. On that date, Samuel Berke was appointed receiver of City Savings by order of this court and has ably acted in that capacity to this date.

Order of September 7, 1968. This order was subsequently appealed and affirmed. Tcherepnin v. Kirby, 416 F.2d 594 (7th Cir. 1968).

On October 10, 1968, Judge Campbell entered an order tentatively delineating two classes of depositors—the plaintiffs consisting of post-July 9, 1959 depositors and the intervening defendants consisting of pre-July 9, 1959 depositors. On March 10, 1970, Judge Campbell held that the plaintiffs were entitled to a preference in the distribution of the assets of City Savings. This order was affirmed on appeal. Tcherepnin v. Franz, 461 F.2d 544 (7th Cir. 1972).

Thereafter, in November, 1974, the plaintiffs, intervening defendants and the receiver entered into a settlement agreement whereby the plaintiffs were dismissed from the case and any further recovery of assets would run to the benefit of the intervening defendants. The plaintiffs had recovered approximately 100 per cent of their investment in City Savings.

On August 6, 1970, Judge Campbell entered an order imposing a constructive trust on certain property located in the Chicagoland area for the benefit of City Savings and its depositors. Tcherepnin v. Franz, 316 F.Supp. 714 (1970). That order was also affirmed on appeal. Tcherepnin v. Franz, 485 F.2d 1251 (7th Cir. 1973).

On January 15, 1969, the receivers filed their First Cross-Complaint, naming Joseph E. Knight, Justin Hulman and Dennis Kirby as cross-defendants. On September 23, 1969, the receivers amended the cross-complaint to name Chris Stolfa, former Supervisors of Savings and Loan Associations of the State of Illinois, Louis Kwasman, Harry Hartman, William DeWoskin, Richard Ray and Steven J. Kadlicek, voluntary liquidators of City Savings, as additional cross-defendants. Cross-defendants Hartman and Kadlicek were also employees of the Department of Financial Institutions for the State of Illinois.

The cross-complaint was again amended to add the State of Illinois and Fidelity and Deposit Company of Maryland as additional cross-defendants. Fidelity and Deposit Company was the surety for the individual cross-defendants.

The gravamen of the Amended First Cross-Complaint is that the named officers and employees of the State of Illinois and the other voluntary liquidators breached their statutory duties to City Savings, thereby rendering themselves, the State of Illinois and their surety liable for damages to the depositors of City Savings.

On April 6, 1972, the State of Illinois moved to dismiss the Amended First Cross-Complaint and for summary judgment. The receivers filed a cross-motion for summary judgment. In a memorandum entered March 12, 1973, this court, with myself presiding, denied the State's motions and granted the receiver's cross-motion for summary judgment against the State of Illinois. In that memorandum, it was specifically found that, "The willful failure of the State through its officials, agents and employees to adequately supervise City Savings . . . was . . . willful and wanton negligence" and that the State was liable to the depositors of City Savings for the damages they incurred as a result of the collapse of that institution. Memorandum, Findings of Fact, Conclusions of Law and Decree entered March 12, 1973, p. 28.

Subsequently, the State and the receivers entered into settlement negotiations. On September 10, 1973, the Governor signed into law a bill passed by the 78th General Assembly appropriating $12,467,500 for the reimbursement of the depositors of City Savings.

On October 9, 1973, this court entered an agreed order approving a settlement between City Savings and the State of Illinois and ordering that the State be dismissed with prejudice as a cross-defendant.

On June 25, 1973, the Estate of Knight filed a motion to dismiss Counts

I, II and III of the Amended First Cross-Complaint.

On November 5, 1973, the receiver filed a motion for summary judgment against cross-defendants Justin Hulman, Chris Stolfa, Louis Kwasman, Harry Hartman, Dennis Kirby, William De-Woskin, Richard Ray, Steven J. Kadlicek and the Estate of Knight, and on February 25, 1974, the receiver filed a motion for summary judgment against cross-defendant Fidelity and Deposit Company of Maryland. Although these motions were initially consolidated for briefing, pursuant to the request of the receiver, the motion for summary judgment against the Estate of Knight was placed on an accelerated briefing schedule and is the subject of this memorandum. The Estate of Knight is a named cross-defendant in the first three counts of the First Amended Cross-Complaint. These counts deal with events in chronological order and will be discussed individually.

### Count I

Count I of the Amended First Cross-Complaint deals with events transpiring between 1959 and June 1964, when City Savings was closed by the State for the second time. Named as cross-defendants are the Estate of Knight, Chris J. Stolfa and Justin Hulman. Donald Swope, who was originally named as a cross-defendant, was dismissed pursuant to this court's order of October 9, 1973.

Joseph E. Knight was the Director of the Department of Financial Institutions for the State of Illinois from January 16, 1962, to April 1968. Prior to that appointment, he served as Secretary to the Illinois Commerce Commission under former Governor Henry Horner, Supervisor of Loan Companies under former Governor Adlai Stevenson and Assistant Director of the Department of Financial Institutions under former Governor Otto Kerner. Knight, pp. 4–5, 11; Legislative Report, p. 54.[4]

Chris J. Stolfa was Supervisor of Savings and Loan Associations for the Department of Financial Institutions from 1959 (1960?) to November 1963. Stolfa had been a state employee since 1942. The bulk of his experience was in the area of state supervision of financial institutions. Stolfa, pp. 3–11; Legislative Report, p. 57.

Justin Hulman was first employed by the State of Illinois on January 15, 1964, as a technical advisor to Joseph Knight. Prior to that, in November and December 1963, Hulman acted as an unofficial advisor to Knight in connection with the examinations of various savings and loan associations which appeared to be in financial straits. On June 5, 1964, Hulman was appointed by Knight as Supervisor of Savings and Loan Associations for the Department of Financial Institutions. On August 1, 1965, his official designation was changed by statute to Commissioner of Savings and Loan Associations, a position he held until his resignation on October 1, 1969. Hulman, pp. 2–7; Legislative Report, pp. 55–56.

Donald Swope was acting Supervisor of Savings and Loan Associations from November 1963 to until June 6, 1964, when he was replaced by Hulman. Stolfa, p. 5; Knight, p. 9.

The Illinois Savings and Loan Act, Ill.Rev.Stat.1963, ch. 32, §§ 701–944, in effect for the period 1959–63, imposed a comprehensive duty on the Director of the Department of Financial Institutions and the officers and employees of that department to supervise the affairs of all savings and loan associations within the state and to ensure that these businesses were operated "only by associations organized and conducted in accordance with the authority provided in this Act." Ill.Rev.Stat.1963, ch. 32, § 702(b).

Section 842(a) of the Illinois Savings and Loan Act required the Director of the Department of Financial Institutions

---

4. References to deposition testimony are indicated by the name of the witness and the page at which the statement appears.

to at least once a year conduct an examination of every savings and loan association in the state:

(a) The Director, at least once in each year, without previous notice, shall cause an examination to be made of the affairs of every association. Such examination shall be made by competent examiners appointed for that purpose, who are not officers or agents of, or in any manner interested in, any association which they examine, except that they may be holders of withdrawable capital.

Section 842(b) of the Act granted to the Director or his examiners access to the books and records of every savings and loan association and empowered them to question the management and employees of those associations regarding the conduct of its affairs:

(b) The officers, agents, or directors of any such association shall cause the books of the association to be opened for inspection by the Director or his examiners and otherwise assist in such examination when requested; and for the purpose of examination, the examiner in charge thereof shall have power to administer oaths and to examine under oath any officers, employees, agents, or directors of such association relative to the business of the association.

Section 842(c) of the Act required the Director of the Department of Financial Institutions to report his findings to the board of directors of the examined institution and to require that any necessary corrective action be taken:

(c) The Director shall make a report of each examination to the board of directors of the association examined, and if the affairs of the association are not being conducted in accordance with this Act, he may require the directors, officers, or employees to take any necessary corrective action. In the interests of the members of the association, the Director may prepare a statement of the condition of the association, and may

mail the same to the members or may require a single publication thereof.

Section 843 empowered the Director of the Department of Financial Institutions to order, without prior notice, an audit by a certified public accountant of the books of any association. Section 844 required every association to file with the Department of Financial Institutions within 60 days following the close of the fiscal year a statement showing its financial condition at the close of the fiscal year. In addition, Section 844 empowered the Director of the Department of Financial Institutions to require any other reports he deemed necessary.

Within this statutory framework, the Director of the Department of Financial Institutions appointed the Supervisor of Savings and Loan Associations. The Supervisor was directly answerable to the Director and was charged with the responsibility of overseeing the affairs of savings and loan associations within the state and reporting any statutory violations or other problems to the Director.

Count I of the receiver's Amended First Cross-Complaint alleges, and these facts are undisputed, that during the period from 1959 through June of 1964 the affairs of City Savings were manifestly not being conducted in accordance with the provisions of the Illinois Savings and Loan Act. During this period, City Savings loaned over $21,000,000 to entities controlled by Mensik or his nominees. Purportedly securing these loans were two proposed real estate developments, the so-called "Apple Orchard" and "Howie in the Hills" projects. These loans were based on grossly inflated and fraudulent appraisals. On June 30, 1964, the date City Savings was closed, the outstanding net unpaid balance of the Apple Orchard loans was $14,827,415.20 and the outstanding net unpaid balance of the Howie in the Hills loans was $5,675,047.14. Tcherepnin v. Franz, 316 F.Supp. 714, 718 (N.D.Ill. 1970). An appraisal made shortly be-

fore the filing of the Amended First Cross-Complaint in 1969 indicated that the true value of the Apple Orchard and Howie in the Hills subdivision properties was $6,391,751.31. These loans were the greatest single factor in the demise of City Savings.

In addition, many other acts of misconduct occurred at City Savings including the use of unacceptable accounting and management practices, self-dealing and questionable advertising practices.[5] It is undisputed that these illegal acts occurred and that they rendered City Savings in a grossly unsound financial condition with a capital impairment of over $14,000,000. Tcherepnin v. Franz, 316 F.Supp. 714 (N.D.Ill.1970); Special Report of Peat, Marwick, Mitchell & Co. regarding City Savings Association dated June 15, 1964; Legislative Report, pp. 36–38, 67–69.

The gravamen of Count I is that the affairs of City Savings were being so grossly mismanaged during the years 1959–64 that no reasonable person could have made even the most cursory examination of City Savings and reasonably have believed it to be sound or that the management should not be removed. The receiver further alleges that during the period from 1959–64 there were either no meaningful examinations made by the Director of the Department of Financial Institutions or that, in the alternative, the examinations in fact were made and the results either ignored or concealed. In either event, the receiver charges that cross-defendants Knight, Stolfa and Hulman breached their statutory duty owing to City Savings, its members, and creditors and are liable for damages arising therefrom.

The Estate of Knight asserts that based upon the information available to Knight, he acted in a manner consistent with his statutory duties as Director of the Department of Financial Institutions.

Illinois decisions have consistently held that public officials vested with discretion and empowered to exercise their judgment are immune from liability to third persons provided that the acts complained of are discretionary in nature, done within the scope of the official's authority and not resulting from malicious or corrupt motives. People ex rel. Schreiner v. Courtney, 380 Ill. 171, 43 N.E.2d 982 (1942); McCormick v. Burt, 95 Ill. 263 (1880); Gilbert v. Bone, 64 Ill. 518 (1872); Anderberg v. Newman, 5 Ill.App.3d 736, 283 N.E.2d 904 (1st Dist. 1972); Paoli v. Mason, 325 Ill.App. 197, 59 N.E.2d 499 (1st Dist. 1945). However, where the duty imposed on a public official is purely ministerial, that official will be held liable to third persons for the negligent performance of that duty. People ex rel. Munson v. Bartels, 138 Ill. 322, 27 N.E. 1091 (1891); Thiele v. Kennedy, 18 Ill.App.3d 465, 309 N.E.2d 394 (3d Dist. 1974); Anderberg v. Newman, supra.

The distinction between ministerial and discretionary duties was discussed in an early Illinois Supreme Court opinion, People ex rel. Munson v. Bartels, supra at 328, 27 N.E. at 1092, where the court said:

> Official action is judicial where it is the result of judgment or discretion. When the officer has the authority to hear and determine the rights of person or property, or the propriety of doing an act, he is vested with judicial power. An officer will be regarded as being clothed with judicial or quasi-judicial functions, when the powers confided to him are so far discretionary that he can exercise or withhold them according to his own judgment as to what is necessary and proper.
>
> . . .
>
> . . . Official duty is ministerial when it is absolute, certain and imperative, involving merely the execu-

5. These acts of misconduct were brought to the attention of State of Illinois officials at least six months prior to closing of City Savings and are discussed at length *infra* at pp. 1209–1211.

tion of a set task, and when the law which imposes it, prescribes and defines the time, mode, and occasion of its performance with such certainty that nothing remains for judgment or discretion. Official action is ministerial when it is the result of performing a certain and specific duty arising from fixed and designated facts.

In practice, however, Illinois courts have tended to confine discretionary immunity to fairly high level public officials and to important decisions by these officials involving determinations of law or fact or the establishment of significant public policy. *See* Kelly v. Ogilvie, 64 Ill.App.2d 144, 212 N.E.2d 279 (1st Dist. 1965), aff'd, 35 Ill.2d 297, 220 N. E.2d 174 (1966); Bush v. Babb, 23 Ill. App.2d 285, 162 N.E.2d 594 (1st Dist. 1959); Paoli v. Mason, *supra*; Baum, Tort Liability of Local Governments and their Employees: An Introduction to the Illinois Immunity Act, 1966 U.Ill.L. F. 981, 997 (1966). A single public officer may have both ministerial and discretionary duties.

■ Public officials are not liable to third persons for the misconduct or negligence of their subordinates provided that the official does not direct the acts complained of or personally cooperate in the negligence from which the injury results. Kelly v. Ogilvie, 35 Ill.2d 297, 220 N.E.2d 174 (1966); 63 Am.Jur.2d Public Officers and Employees § 295 (1972).

■ Finally, the failure to perform a public duty can constitute an individual wrong only when it is shown that the duty was owed not only to the State of Illinois but also to the private individuals seeking redress. People of the State of Illinois v. Maryland Casualty Co., 132 F.2d 850 (7th Cir. 1942); State v. American Surety Co., 26 Idaho 652, 145 P. 1097 (1914).

Although the standards of liability enumerated above have not been applied to state banking officials by Illinois courts, the courts of other states have applied analogous principles to their state banking officials. Deatsch v. Fairfield, 27 Ariz. 387, 233 P. 887 (1925); Dunbar v. Faut, 170 S.C. 414, 170 S.E. 460 (1913); State v. American Surety Co., 26 Idaho 652, 145 P. 1097 (1914); Keefe, Personal Tort Liability of Administrative Officials, 12 Fordham L.Rev. 130, 141–43 (1943).

■ The Estate of Knight contends that the allegations contained in Count I are insufficient to support a cause of action because: 1) there is no allegation of direct participation or supervision by Knight in the wrongful acts; and 2) there are no specific allegations of malice or corruption on the part of Knight.

The short answer to the first contention is that the cross-complaint while not specifically charging Knight with wrongful acts, does allege that the Director of the Department of Financial Institutions committed these acts and that Knight was the Director of the Department of Financial Institutions during this period.

■ In considering the second contention raised by the Estate of Knight, the court first notes that the cross-complaint need not specifically characterize Knight's conduct as being "malicious or corrupt" provided that the acts complained of necessarily involve a malicious disregard of his obligations to the depositors of City Savings. State v. Dixon, 80 Kan. 650, 103 P. 130 (1909). Thus, the crucial issue is whether Knight's alleged failure to conduct the required examinations of City Savings or, after having conducted such an examination, his alleged concealment or ignoring of the results constitutes a malicious breach of his statutory duty to supervise the affairs of City Savings.

The adjective "malicious" connotes something more than mere negligence. It has been variously defined as: the intentional commission of a tortious act; the willful and reckless disregard of an-

other's rights; and the wanton and deliberate commission of a wrongful act.[6]

 Knight had a statutory duty to supervise the affairs of City Savings and to ensure that it was operating in accordance with the provisions of the Illinois Savings and Loan Act. This obligation ran directly to the depositors of City Savings. State v. American Surety Co., *supra*. The conclusion is inescapable that if, in fact, Knight intentionally ignored or concealed examinations indicating that the investments of the City Savings depositors were being jeopardized by the failure of City Savings to conduct its business in accordance with the provisions of the Illinois Savings and Loan Act that, under any of the accepted definitions, he was "maliciously" breaching his statutory duty owed to those depositors. It is therefore the opinion of the court that the motion to dismiss Count I of the Amended First Cross-Complaint must be denied.

 Having rejected the motion to dismiss Count I, the court now turns to the receiver's motion for summary judgment. The first issue to be resolved is the effect this court's order of March 12, 1973, may have had upon the imposition of the burden of proof on the motion for summary judgment. Rule 56 of the Federal Rules of Civil Procedure clearly imposes on the party moving for summary judgment the burden of demonstrating that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Melancon v. Insurance Company of North America, 482 F.2d 1057 (5th Cir. 1973); Ashwell & Company v. Transamerica Insurance Company, 407 F.2d 762 (7th Cir. 1969); 6 Moore's Federal Practice ¶ 56.15[3] and cases cited therein.

This court's order of March 12, 1973 found that "the Supervisors of Savings and Loan Associations and the Director of Financial Institutions were to say the least grossly negligent in their supervision of what has become the notorious City Savings Association." Memorandum, Findings of Fact, Conclusions of Law and Decree of March 12, 1973, p. 20. On October 9, 1973, as part of the receiver's settlements with the State of Illinois, that memorandum was "withdrawn and vacated insofar as the rights, liabilities and interests of the State of Illinois and its present officers and officials are concerned." Order of October 9, 1973, p. 4. No mention was made as to the effect the findings made in the March 12, 1973 order would have on the receiver's claims against the cross-defendants other than the State of Illinois. It is the receiver's contention that the findings of fact and conclusions of law contained in this court's March 12, 1973 order were left intact insofar as they relate to the cross-defendants other than the State of Illinois and thus the cross-defendants have the burden of disproving these findings.

The court is of the opinion that the burden of proof in the instant motion for summary judgment lies with the receiver. Although findings of fact were made which reflect upon the conduct of the remaining cross-defendants, these parties were not given an opportunity at that time to respond to the receiver's allegations. In fairness to the remaining cross-defendants, the court cannot impose the additional burden of overturning those findings.

Practically speaking, the remaining cross-defendants do have the burden of coming forward with new evidence or additional arguments which would persuade the court that it was in error when

6. The cases supporting these definitions are legion. *See, e. g.*, Fromm v. Seyller, 245 Ill.App. 392 (2d Dist. 1927); Kaplan v. Williams, 245 Ill.App. 542 (1st Dist. 1927); Smith v. Moran, 43 Ill.App.2d 373, 193 N.E. 2d 466 (2d Dist. 1967); State v. Dixon, 80 Kan. 650, 103 P. 130 (1909); Baer v. Ro-

senblatt, 106 N.H. 26, 203 A.2d 773 (1964); Maddix v. Gammon, 293 Ky. 540, 169 S.W.2d 594 (1943); McElwain v. Georgia-Pacific Corp., 245 Or. 247, 421 P.2d 957 (1966); Loucks v. Albuquerque National Bank, 76 N.M. 735, 418 P.2d 191 (1966).

it issued its March 12, 1973 order. In any event, the court has reviewed anew the record in its entirety and has applied to the evidence the standards set forth in the cases and treatise cited above.

■ Applying these standards to the massive record in this case, the court is of the opinion that Joseph E. Knight willfully and maliciously disregarded his duty to supervise City Savings during the period he was Director of the Department of Financial Institutions and that his estate is liable to the depositors of City Savings for the damages arising from these acts. The undisputed testimony and admissions of Knight and other state officials clearly support this conclusion.

Knight testified that he first learned that City Savings was in financial straits in the latter part of 1963 when he was advised by either Justin Hulman or Donald Swope that City Savings had made excessive loans on both the Apple Orchard and Howie in the Hills developments. Knight, pp. 21–25. In fact, as was described above, City Savings made loans exceeding $21,000,000 to develop these real estate projects. The actual estimated value of these properties at the time City Savings was closed in June of 1964 was only $2,000,000. Tcherepnin v. Franz, 316 F.Supp. 714, 718 (N.D.Ill.1970). Knight testified that the only corrective measure taken by him at this time was to order that appraisals be made on the properties. Wigo Juergensen, testifying on behalf of Knight, stated that the appraisals were not ordered until after the Peat, Marwick audit was requested on April 30, 1964. These appraisals were not prepared until early June 1964. Juergensen, pp. 6–9. Thus, no action was taken by Knight until April 30, 1964—four months after he first learned of the overvalued loans.[7]

In January 1964, Knight asked Justin Hulman to examine the records of City Savings that were in the possession of the Department of Financial Institutions. Knight, pp. 40–41. Since November, 1963, Hulman had been conducting a series of examinations of financially troubled savings and loan associations for Knight. Hulman, pp. 11–29. During the period November–December 1963, Hulman was acting in the capacity of an unofficial advisor to Knight.

Prior to investigating City Savings, Hulman had reviewed the records of both Beverly and Tinley Park Savings and Loan Associations. Hulman, p. 15. In these initial studies, Hulman discerned a pattern common to both institutions. He found evidence of excessive loans on overvalued properties, loans to officers, gross mismanagement and some instances of outright fraud. Hulman, pp. 15–17; Knight, pp. 56–64. These findings were reported to Knight in late November 1963. Hulman, p. 17.

Hulman then commenced an examination of the records of Marshall Savings and Loan Association. At Marshall he again found that excessive mortgage loans were being made on overvalued properties. Hulman, pp. 22–23. He also uncovered instances of mismanagement and faulty credit reporting. Hulman, pp. 23–24.

On January 15, 1964, Hulman became a salaried technical advisor to Knight. His continuing investigation of the savings and loan industry disclosed that the records of several other institutions showed irregularities similar to those found at Tinley Park and Beverly. Among the institutions Hulman examined were Success Savings and Loan Association, Service Savings and Loan Association, Apollo Savings and Loan Association and Old Reliable Savings and

---

7. Both Knight and Hulman have testified that the appraisals of the Howie in the Hills and Apple Orchard projects were ordered in January 1964 and received in March. Knight, pp. 25, 82–84; Hulman, p. 73. If this version is accurate, Knight must have known of City Savings' severe capital impairment at least four months prior to its closing. Thus, under either version, Knight's culpability is clear. The court, however, for the purposes of the motion for summary judgment must accept Juergensen's statement as accurate.

Loan Association. Hulman, pp. 28–29. During the course of these examinations, Hulman noticed that the names of Angelo LoMonaco and Frank Sorrentino repeatedly appeared as appraisers for Tinley Park, Beverly and Marshall. Hulman, p. 23. LoMonaco and Sorrentino also acted as appraisers for many properties securing mortgage loans issued by City Savings. Hulman, p. 69.

With this background, Hulman commenced his examination of the records of City Savings in January 1964. Hulman, p. 40. In conducting his examination, Hulman relied solely upon the records on file with the Department of Financial Institutions.[8] Hulman, p. 40. Later that month he reported his findings to Knight and Swope. Hulman, p. 50.

Hulman advised Knight that City Savings was "in trouble." Hulman, p. 50. He noted that $779,000 listed on the books of City Savings as an asset represented monies used to purchase premiums which had already been given away to entice new depositors. If this asset were written off, as it properly should have been, the reserves of the association would have been insufficient to cover even a minor loss. Hulman, p. 50; Knight, p. 72.

Another matter of concern which was discussed at the meeting was City Savings' practice of refinancing loans. In general, City Savings financed subdivision developments in three phases. In phase one, mortgage money was loaned for the purchase of raw farm land. In phase two, the mortgage loans on the same property were increased for the purpose of subdividing the land and constructing sewers, streets and other improvements. The outstanding balance of the first loan was repaid from the proceeds of the second mortgage loan. In phase three, the mortgage loan was again increased on the same property for the purpose of constructing buildings. The unpaid balance of the second loan was repaid from the proceeds of the third loan. Tcherepnin v. Franz, 316 F. Supp. 714, 718 (N.D.Ill.1970). Every time City Savings refinanced a loan it charged a 4 percent loan commission. Thus, there was income accruing on the books of City Savings without the receipt of any actual cash. Hulman, pp. 52–53.

Another problem area pointed out to Knight was that while the amount of money deposited in the accounts of City Savings remained static for several years, the costs of maintaining these accounts continued to rise and were excessive. Hulman, p. 55. In addition, Hulman's examination revealed the now familiar pattern of excessive loans on overvalued properties. Again the names of LoMonaco and Sorrentino frequently appeared as appraisers for City Savings. Hulman, p. 69; Knight, p. 69. Finally, Hulman advised Knight that the contingent reserve position of City Savings was dangerously low. Hulman, pp. 55, 62–65; Knight, p. 72.

Knight's treatment of City Savings' contingent reserve situation is typical of his utter failure to exercise any degree of supervision over the affairs of City Savings. Section 779(a) of the Il-

---

8. On file with the Department of Financial Institutions were the audit reports of Stanley Mize, a certified public accountant. During the years 1960 through 1963, Mize filed a series of increasingly critical audit reports in which the following deficiencies were pointed out:

(a) Lack of control over cash transactions;
(b) Distributions to shareholders in excess of net income;
(c) Sharply increasing expenses for maintaining a relatively stable amount of deposits;

(d) Excess payouts to holders of withdrawable capital shares under Section 773 of the Illinois Savings and Loan Act, Ill. Rev.Stat.1963, ch. 32, § 773;
(e) The concentration of 69% of all mortgage loans among fifteen borrowers;
(f) The improper deferment of excessive advertising costs to years in which said costs would produce virtually no benefits; and
(g) The transfer of funds from contingent reserves in order to pay dividends to the holders of withdrawable capital shares.

linois Savings and Loan Act, Ill.Rev. Stat.1963, ch. 32, § 779(a), provided:

(a) Each association shall have a contingent reserve to which the board of directors shall allocate such portion of the association's profits as the board may determine; except that whenever the total amount of such reserve together with special reserves for losses and the insurance reserve of an insured association is less than 7½% of the aggregate withdrawal value of the association's withdrawable capital accounts, the allocation to such contingent, special reserve or the insurance reserve of an insured association upon each apportionment of profits shall total not less than 10% of the profits being apportioned, or such lesser portion as will increase the aggregate of such reserves to the required total amount. In lieu of the requirements specifically set forth in the preceding sentence, an *insured* association may make such allocations to the reserves as may from time to time be required by the insurance corporation. (Federal Savings and Loan Insurance Corporation]. [Emphasis added.]

Section 780(b)(1) of that Act provided:

(b) However, the declaration of dividends on capital shall be subject to the following restrictions:

(1) No dividends shall be declared when the total amount of the contingent reserve is less than that required by the section of this Act concerning Reserves [Section 779(a)], unless the allocation provided by said section has been made.

Knight has admitted that he knew in 1963 and 1964 that the contingent reserves of City Savings were less than the statutory minimum of 7½ percent. Knight, p. 71. Yet, he permitted City Savings to declare a dividend in December 1963 in clear violation of Section 780(b)(1). Hulman explained that City Savings had been permitted to operate under the lower standards established for associations insured by the Federal Savings and Loan Insurance Corporation. Hulman, p. 65. City Savings was not and has never been insured by the federal government. As a result, any losses incurred by City Savings would fall directly on the depositors. In addition, Section 779(a) specifically provided that the lower standard could only be applied to federally insured associations.

Knight's willful and malicious conduct is further exemplified by his admission that during 1963 he became aware of the identities of the officers and directors of the corporation to which City Savings made loans and that "to a certain extent" these same individuals were officers and directors of a majority of the corporations to which City Savings made mortgage loans. Knight, p. 74. In fact, City Savings had extended vast amounts of financing to corporations controlled by essentially the same people. While such financing is not illegal per se, it is certainly highly unusual and when coupled with the massive irregularities uncovered by Mize and Hulman it should have alerted Knight that further investigation was necessary. Knight's failure to probe into the background of these loans enabled Mensik to concentrate 82 percent of the entire loan portfolio of City Savings into the Apple Orchard and Howie in the Hills subdivisions. These loans totaled over $21,000,000 of the association's book assets of $32,000,000. The loans were made to entities controlled by Mensik and Robert Kramer, Mensik's brother-in-law and a vice-president of City Savings, or their nominees. Tcherepnin v. Franz, 316 F.Supp. 714 (N.D.Ill.1970). This was in clear violation of Section 801 of the Illinois Savings and Loan Act which provided, in part:

No loan shall be made to [an] . . . officer, or director of an association . . . either for himself or as agent, or as partner of another, except upon real estate occupied by such . . . officer, or director as

a homestead, or upon the security of withdrawable capital; nor shall any loan be made by an association to any corporation of which a majority of the stock is owned or controlled individually or collectively by any one or more of the directors, [or] officers . . . of such association.

It is clear from these undisputed facts that Knight was fully aware of City Savings' precarious financial position as early as January 1964. It is also painfully evident that the facts underpinning Hulman's report were readily available to Knight, in the form of the Stanley Mize audits, prior to the January 1964 meeting. Yet, incredibly, Knight failed to take any action until April 30 when the Peat, Marwick audit was ordered and did not attempt to correct the massive irregularities pointed out by Hulman and Mize until City Savings was closed on June 26, 1964.

Knight's failure to act decisively prior to June 1964 is rendered even more inexcusable by the fact that he was aware throughout this period that Mensik and City Savings had encountered serious financial difficulties in 1957–59, that City Savings had been unable to secure insurance from the federal government and thus any losses it incurred would fall directly on the depositors and that Mensik had been indicted and convicted for mail fraud in Maryland in November 1963.[9] Knight, pp. 22, 68–69.

In light of all these undisputed facts, the record is crystal clear, and the court so finds, that Joseph E. Knight willfully and maliciously breached his statutory duty to supervise the affairs of City Savings during the period he served as Director of the Department of Financial Institutions and that he is liable to the the depositors of City Savings for any losses incurred as a result thereof. Neither of the parties has addressed the issue of damages and therefore that question shall be reserved for later proceedings.

### Count II—Fraud Theory

Count II of the Amended First Cross-Complaint deals with the events surrounding the adoption of the so-called plan of voluntary liquidation in March–July 1964. Named as cross-defendants are the Estate of Knight and Justin Hulman. Throughout this period Joseph E. Knight was Director of the Department of Financial Institutions. Justin Hulman served as technical advisor to Knight regarding savings and loan associations until June 15, 1964, when he was appointed by Knight as Supervisor of Savings and Loan Associations for the Department of Financial Institutions.

■ The gravamen of Count II is that Knight and Hulman permitted Mensik to foist a fraudulent and illegal plan of voluntary liquidation upon the City Savings depositors. As a result, no judicial supervision over City Savings occurred from June 26, 1964 until Judge Campbell terminated the voluntary liquidation and appointed federal receivers on September 7, 1968. The receiver further alleges that the voluntary liquidators committed many acts of mismanagement during the four-year period they were in control of the City Savings assets and also that Knight and Hulman by reason of their participation in the adoption of the plan are liable to the depositors of City Savings for any losses incurred thereby.

The receiver asserts that Knight's liability may be independently based on either of two factual theories. Under the

9. Mensik was first indicted in Baltimore, Maryland for mail fraud in 1958. After extended and complex litigation, he was finally convicted in November 1963. Moreover, on January 16, 1962, Mensik was found by the Tax Court of the United States to have engaged in sundry frauds and irregularities at City Savings. 37 T.C. 703 (1962). This finding of fraud was subsequently affirmed by the Court of Appeals for the Seventh Circuit on February 10, 1964. Mensik v. C.I.R., 328 F.2d 147 (7th Cir. 1964), cert. denied, 379 U.S. 827, 85 S.Ct. 55, 13 L.Ed.2d 37 (1964). These public, reported orders and opinions were all filed before Knight ordered the belated closing of City Savings.

first, the receiver alleges that Knight, Hulman and Theodore J. Isaacs fraudulently entered into a secret deal with Mensik to impose the illegal voluntary liquidation on the City Savings depositors and that pursuant to that deal the law firm of which Isaacs was a partner was to receive legal fees of $1,000,000. Under the second theory, the receiver contends that even if Knight had been acting in good faith when he endorsed the plan of voluntary liquidation, the plan was contrary to Illinois law and thus Knight is liable for any losses resulting from its adoption.[10]

The receiver's first theory is based primarily upon the testimony of C. Oran Mensik, president, board chairman and chairman of the Executive Committee of City Savings. Mensik, p. 3. Mensik testified that shortly after Peat, Marwick initiated its audit of City Savings he met with State Representative William Pollack. Mensik, pp. 9–10. The pending audit was discussed and Pollack advised Mensik to contact Theodore J. Isaacs, a private attorney in Chicago and former Director of the Department of Revenue for the State of Illinois,[11] whom Pollack thought could "work something out." Mensik, p. 10.

Several days later, Mensik visited Isaacs at his office. Mensik, pp. 11–12. Mensik explained the difficulties City Savings had encountered with the Department of Financial Institutions and that Representative Pollack suggested

that Isaacs may be able to work out a solution. Mensik, pp. 13–14. Mensik offered Isaacs a City Savings check for $5,000 if he would act as the association's attorney in this matter. Mensik, pp. 65–66. Isaacs refused, saying that the $5,000 was not enough for "attorney's fees." Mensik, pp. 13–14. Isaacs then told Mensik to see Justin Hulman and that Hulman would have a "deal" for him. Mensik, p. 14. Isaacs said, "Don't worry about anything. . . . We'll work it out. . . . You'll get your details from Mr. Hulman." Mensik, pp. 13–14.

Subsequent to this conversation, Mensik had four or five meetings with Hulman, the first occurring in May 1964.[12] At the first meeting, Hulman and Donald Swope discussed City Savings' deteriorating financial condition with Mensik and advised him that they felt that City Savings was in serious trouble. Mensik, pp. 16–17; Hulman, pp. 78–83. Of particular concern were the appraisals made on the Apple Orchard and Howie in the Hills developments and City Savings' practice of crediting income to its books each time it refinanced prior loans.

In the second meeting, 10 days to two weeks later, Hulman handed over to Mensik a copy of the Peat, Marwick audit and told Mensik that City Savings would have to be closed. Mensik, pp. 18–19. Hulman rejected the idea of a court-supervised receivership in favor of

---

10. The rule in Illinois is that public officials are not liable to third persons for the misconduuct or negligence of their subordinates provided that the official does not direct the acts complained of or personally cooperate in the negligence from which the injury results. Kelly v. Ogilvie, 35 Ill.2d 297, 220 N.E.2d 174 (1966); 63 Am.Jur.2d Public Officers and Employees § 295 (1972). Contrary to the contention of the Estate of Knight, the direct and active participation of Knight under both factual bases supporting Count II has been alleged in both the First Amended Cross-Complaint and in the memorandum filed in support of the motion for summary judgment. Therefore a motion to dismiss based on this contention must be denied.

11. Isaacs was Illinois Director of Revenue from 1961 to 1963 under former Governor Otto Kerner. On February 19, 1973, Isaacs and Kerner were convicted of a variety of offenses arising out of their activities on behalf of certain Illinois racing interests in return for bribes of more than $150,000. Their convictions were affirmed on appeal. United States v. Isaacs, 493 F.2d 1124 (7th Cir. 1974).

12. With the exception of the alleged deal, Hulman's account of these conversations generally corresponds with Mensik's. Hulman, pp. 78–84; 92–95; 99–102; 106–107.

placing City Savings in "voluntary liquidation." Hulman noted that if City Savings was placed into receivership, a 3 percent fee would have to be paid to the receivers. Mensik, pp. 19–20. It was at this point that the alleged deal was proposed by Hulman.

There were to be three "voluntary liquidators", two of whom would be state examiners and employees of the Department of Financial Institutions and the third would be a Mensik appointee. Mensik, pp. 19–20. The State of Illinois would assume clerical and other costs of the liquidation, including the salaries of its own employees. Mensik, pp. 19–20. Mensik was to be responsible for securing the necessary approval from the City Savings depositors. Mensik, p. 20. The 3 percent fee which normally would have been paid to receivers was to be paid to the Isaacs law firm for representing the liquidators. Mensik, p. 20. In return, Mensik was to retain any income derived from the placement of property insurance on homes City Savings held mortgages on—approximately $35,000 per year. In addition, Mensik would continue to operate the City Safe Deposit Company, a separate business entity from City Savings which rented safe deposit boxes to depositors. Mensik, pp. 21–22. When asked if this was the "deal" Isaacs had referred to, Hulman replied, "This is the deal." Mensik, p. 20. Mensik told Hulman that he would think it over and call him in another week or so. Mensik, p. 20.

At the third meeting, Mensik agreed to the plan of voluntary liquidation but insisted that $2,000,000 be set aside to complete the Apple Orchard and Howie in the Hills subdivisions. It is unclear from Mensik's testimony whether Hulman agreed to this additional provision. Mensik, p. 24.

The last two conversations took place in the latter part of June 1964 when Hulman called Mensik and asked him to come to his office to discuss further the plan of liquidation. Mensik, pp. 25–28. Mensik refused on each occasion and on June 26, 1964, state examiners took custody of City Savings. Mensik, p. 28.

On July 28, 1964, Mensik called a meeting of City Savings depositors to obtain their approval of the plan of voluntary liquidation. This meeting was attended by Department of Financial Institutions employees Harry Hulman and Dennis Kirby and Assistant Attorney General Robert Meersman. Knight, p. 35; Hulman, p. 137. At this meeting, one of the attorneys for City Savings told the depositors:

> It is the considered opinion of the management and everybody connected with it that if an orderly liquidation takes place such as we propose, a voluntary liquidation under the plan that we have submitted to you, that you folks will get every nickel of your money and there will be some money left for the declaration of a dividend. [Transcript of Shareholders' Meeting held July 28, 1964, p. 33.]

In addition, Mensik personally assured the depositors that they would receive "100 cents on the dollar" plus interest if the plan was adopted. Hulman, p. 136; Transcript of Shareholders' Meeting held July 28, 1964, p. 6.

Although the plan of liquidation was prepared by Robert Sharfman, an assistant Attorney General of the State of Illinois,[13] Sharfman, pp. 35–40, and endorsed by Hulman and Knight, Hulman, p. 113; Knight, pp. 76–79, when the Department of Financial Institutions' representative at the meeting, Assistant Attorney General Robert Meersman, was asked by a depositor to give the State's view of the plan, he responded, "The State of Illinois, at this time, takes no interest in this meeting until such time as the liquidation plan is approved. At that time, the State will take active control." Transcript of Shareholders' Meeting held July 28, 1964, p. 65. Meersman made no attempt to interrupt,

---

13. See pp. 1218–1219, *infra.*

clarify or correct the fraudulent statements made by Mensik and his attorney.

Both Knight and Hulman admittedly read the transcript of the meeting and heard reports of Mensik's representations. Hulman, pp. 118–119; Knight, pp. 35–36. Although both realized that the representations were grossly fraudulent, neither attempted to correct Mensik's statements or advise the depositors that they could never receive 100 cents on the dollar plus interest as a result of the plan. Knight, pp. 37, 79; Hulman, p. 37.

The plan of voluntary liquidation was approved by a majority of the depositors present at the meeting, with Mensik voting his fraudulently solicited proxies in favor of the plan. Knight, pp. 76–77. On September 11, 1964, state custody of City Savings was terminated. Legislative Report, p. 18.

Pursuant to the plan, Knight appointed two liquidators, Dennis Kirby and Harry P. Hartman, and Mensik appointed the third, Louis Kwasman. Kwasman was a business associate of Mensik and had supplied City Savings with the premiums which were given away to entice new depositors. Mensik, pp. 66–68. Throughout the liquidation, Kwasman acted as Mensik's personal representative. Mensik, pp. 29–41. Knight then appointed Seymour Burton to represent the depositors. At that time Burton was a partner of Theodore Isaacs. Knight, pp. 47–49.

Mensik claimed that he was "double-crossed" by the state officials. He was not permitted to operate the City Safe Deposit Company nor did he receive any commissions from the placement of property insurance. Mensik, pp. 100–101. Seymour Burton, however, did receive nearly $450,000 in legal fees for representing the liquidators prior to the appointment of the federal receivers. Report of Special Master Milton Gray dated July 25, 1974, p. 72.

 Clearly, the receiver has alleged instances of official misconduct committed with Knight's complicity which, if true, were tainted with fraudulent, malicious and corrupt motives and are sufficient to overcome a motion to dismiss. It is also evident that the commission of these acts breached a statutory duty owed directly to the depositors of City Savings. State v. American Surety Co., 26 Idaho 652, 145 P. 1097 (1914).

However, the state officials involved, Joseph Knight and Justin Hulman, as well as Theodore Isaacs have categorically denied any participation in a "deal" to defraud the depositors of City Savings. Hulman, pp. 151–53; Knight, pp. 75–77. Therefore, for the purposes of the receiver's motion for summary judgment, the court must determine if Knight's acquiescence in the fraudulent representations made at the July 28, 1964 depositors' meeting was sufficient to constitute actual fraud on his part.

 In order to sustain an action for fraud it must be established that the defendant made false representations as to a material fact, knowing or believing it to be untrue, with the intent to deceive the plaintiff and that the plaintiff believed these representations, reasonably relied on them and acted on them to his injury. Johnston v. Shockey, 335 Ill. 363, 167 N.E. 54 (1929); Davis v. Nehf, 14 Ill.App.3d 318, 302 N.E.2d 382 (1st Dist. 1973).

 Fraud may consist of the concealment or suppression of the truth as well as the positive assertion of a falsehood. Lagen v. Lagen, 14 Ill.App. 3d 74, 302 N.E.2d 201 (1st Dist. 1973). It is unnecessary that the defendant in an action for fraud have any interest in the result of the fraud, or should derive any benefit from it. Bergman & Lefkow Ins. Agency v. Flash Cab Co., 110 Ill. App.2d 415, 249 N.E.2d 729 (1st Dist. 1969).

 In applying these standards to Knight's conduct, the court is, of course, mindful of Knight's special status as a public official and that he cannot be held accountable for his conduct in office without a showing of malice.

However, one of the indispensable elements of fraud is the existence of fraudulent intent or intent to deceive. Lickus v. O'Donnell, 321 Ill.App. 144, 52 N.E.2d 271 (2d Dist. 1943). This element coupled with the requisite scienter is, in the opinion of the court, sufficient to establish malicious intent.

 Although the fraudulent promises upon which the depositors relied were made by Mensik or his attorneys, the imposition of the plan of voluntary liquidation could not have been accomplished without the passive acquiescence of the state officials at the meeting and Knight's subsequent silence. The law is clear that a person who, by his conduct, contributes to the misapprehension of another as to a material matter, and intentionally fails to correct the misapprehension, is guilty of fraud. Mitchell v. McDougall, 62 Ill. 498 (1872); Endsley v. Johns, 120 Ill. 469, 12 N.E. 247 (1887); Bell v. Felt, 102 Ill.App. 218 (1st Dist. 1902), modified on other grounds sub nom. Felt v. Belt, 205 Ill. 213, 68 N.E. 794 (1903). See Piff v. Berresheim, 405 Ill. 617, 92 N.E.2d 113 (1950); Creighton v. Elgin, 395 Ill. 87, 69 N.E.2d 501 (1946).

 Knight's failure to correct the misrepresentations of Mensik and his attorneys is rendered even more culpable by his status as a public official. As Director of the Department of Financial Institutions, Knight had at a minimum a duty to ensure that state-chartered savings and loan associations were operated "only by associations organized and conducted in accordance with the authority provided in [the Savings and Loan] Act," Ill.Rev.Stat.1963, ch. 32, § 702(b), and thereby safeguard the investments of the depositors of those institutions. State v. American Surety Co., 26 Idaho 652, 145 P. 1097 (1914). By at least June 26, 1964, the date the State took custody of the assets of City Savings, the relationship between Knight and the depositors became that of fiduciary-beneficiary. Whitbeck v. Ramsay's Estate, 74 Ill.App. 524 (4th Dist. 1896). As a fiduciary, Knight had a duty of full and complete disclosure. It has been held that while mere silence does not usually amount to fraud, where the defendant has a duty to speak his failure to correct a material misapprehension constitutes actual fraud. Racine Fuel Co. v. Rawlins, 377 Ill. 375, 36 N.E.2d 710 (1941); Forest Preserve Dist. of Cook County v. Christopher, 321 Ill.App. 91, 52 N.E.2d 313 (1st Dist. 1944); Equitable Life Ins. Co. of Iowa v. Halsey, Stuart & Co., 112 F.2d 302 (7th Cir. 1940), rev'd on other grounds, 312 U.S. 410, 61 S.Ct. 623, 85 L.Ed. 920 (1941).

For these reasons, the court is of the opinion that the receiver's motion for summary judgment must be granted as to Count II. This conclusion finds further support in the receiver's second factual basis for summary judgment—the statutory violation theory.

### Count II—Statutory Violation Theory

Section 921 of the Illinois Savings and Loan Act, Ill.Rev.Stat.1963, ch. 32, § 921, provided that if any one or more of the reasons for taking custody of a savings and loan association continues through the period of custody, the Director of the Department of Financial Institutions shall appoint a receiver:

> If the Director, after taking custody of an association . . . finds that any one or more of the reasons for taking custody continues to exist through the period of his custody, then he shall appoint any qualified person, firm or corporation as receiver or co-receiver of such association or trust for the purpose of liquidation.

In addition, Section 922 of that Act provided:

> After so appointing a receiver, the Director [of the Department of Financial Institutions] shall direct the Attorney General to file a complaint in equity in the name of the Director in the circuit or superior court of the county in which such association or trust is located and against the asso-

ciation or trustees or liquidators, as the case may be, for the orderly liquidation and dissolution of the association or trust and for an injunction restraining the officers, directors, trustees, or liquidators, from continuing the operation of the association or trust.

■ These provisions prescribed a statutory duty owed by the Director of the Department of Financial Institutions directly to the depositors of City Savings. State v. American Surety Co., 26 Idaho 652, 145 P. 1097 (1914).

Hulman and Knight have testified that the State took custody of City Savings for all the reasons enumerated in Section 848 of the Illinois Savings and Loan Act, Ill.Rev.Stat.1963, ch. 32, § 848. Knight, pp. 37–40; Hulman, pp. 107–111. That section provided, in relevant part:

The Director [of the Department of Financial Institutions] in his discretion may take custody of the books, records and assets of . . . any association . . . if it appears from reports made to the Director, or from examination made by or on behalf of the Director:

(a) That the directors, officers, trustees, or liquidators have neglected, failed or refused to take any action which the Director may deem necessary for the protection of the association or trust, or have impeded or obstructed an examination; or

(b) That the withdrawable capital of the association is impaired to the extent that the realizable value of its assets is insufficient to pay in full its creditors and holders of its withdrawable capital; or that its permanent reserve capital is impaired; or

(c) That the association is unable to continue operations; or

(d) That the business of the association, trust, or association in liquidation is being conducted in a fraudulent, illegal, or unsafe manner; or

(e) That the officers, employees, trustees, or liquidators have continued to assume duties or perform acts without giving bond as required by the provisions of this Act.

Hulman further testified that the State closed City Savings on June 30, 1964 for two reasons: (1) the Association was unable to pay a dividend because of its capital impairment; and (2) the Association "had completely run out of money." Hulman, p. 111.

Both Knight and Hulman stated that at the time of the adoption of the voluntary liquidation plan by the depositors as well as at the time the assets of City Savings were transferred to the voluntary liquidators, September 11, 1964, none of the conditions precipitating the State's taking custody of City Savings were cured. Knight, p. 40; Hulman, pp. 88–100. Yet, in direct contradiction of Sections 921 and 922 of the Illinois Savings and Loan Act, Knight failed to: (1) appoint a receiver for City Savings; (2) direct the Attorney General to file a complaint against City Savings to ensure an orderly dissolution; or (3) direct the Attorney General to seek an injunction restraining the officers and directors of City Savings from continuing operations. Knight, pp. 46–47.

Knight contends that he is not responsible for any possible illegalities contained in the plan of voluntary liquidation because he is not an attorney and because in recommending the plan he relied upon the legal advice of the Illinois Attorney General. Knight, pp. 92–93. In 1964, the Illinois Attorney General was William G. Clark. Clark has testified that he could not recall either researching the Illinois Savings and Loan Act to determine if the plan was legal or discussing the City Savings situation with Knight or any other state official. Clark, pp. 14, 29–30. Clark did indicate that Robert Sharfman, then an assistant Attorney General, prepared the plan. Clark, p. 12.

Sharfman testified that he was first employed by the Attorney General in November 1963. Sharfman, p. 4. Sharfman's first contact with the Department of Financial Institutions was in 1964 when he was asked to prepare the plan of voluntary liquidation for City Savings. Sharfman, pp. 6–7. At that time, Sharfman freely admitted to the Department officials that he "didn't have the slightest idea of what a plan involves or what to do." Sharfman, p. 7. Sharfman's actual role in the preparation of the plan came to light during cross-examination by the receiver's attorney:

By Mr. Serritella:

Q Did you in fact do more than change the names and dates of the old plan?

A I did nothing more than that. If you check the plan of Beverly or Tinley Park and check the plan here, you will see they are identical word for word with the exception of three [liquidators instead of two.]

Q You did not decide that City Savings was to have a voluntary liquidation, is that correct?

A That wasn't my decision.

Q Your were just told, prepare the plan and this is the plan that you were suppose to prepare, is that correct?

A I think that is my recollection, yes, that is my recollection. Now, I think others would have a different opinion, by the way. I don't remember ever being asked about what is proper at that time.

Q Do you have a recollection of doing any legal research as to whether or not the plan was proper as with respect to City Savings?

A No, I don't. . . .

Q You don't recall doing any research yourself as to whether or not the plan was proper with respect to City Savings?

A I remember just looking at the section and saying what should be in the plan, not whether the plan should be adopted.

Q You never wrote a legal memo on the subject?

A I don't believe I ever wrote—I don't believe I ever wrote a legal memo in this case at all . . . . [Sharfman, pp. 36–38.]

██ The record is clear, and the court so finds, that Knight did not rely upon the advice of the Attorney General or his assistants in preparing the plan of voluntary liquidation. It is equally clear that Knight, in permitting the adoption of the plan, breached his statutory duties prescribed under Sections 921 and 922 of the Illinois Savings and Loan Act.

The law is well established that where a duty imposed on a public official is purely ministerial, and does not involve the exercise of discretion, the official is liable for injuries caused by the negligent performance of that duty. People ex rel. Munson v. Bartels, 138 Ill. 322, 27 N.E. 1091 (1891); Thiele v. Kennedy, 18 Ill.App.3d 465, 309 N.E.2d 394 (3d Dist. 1974); Anderberg v. Newman, 5 Ill.App.3d 736, 283 N.E.2d 904 (1st Dist. 1972); Lusietto v. Kingan, 107 Ill. App.2d 239, 246 N.E.2d 24 (3d Dist. 1969); 63 Am.Jur.2d Public Officers and Employees §§ 292–293 (1972).

█ It has been held that the failure of a public official to perform an act required by statute constitutes an actionable breach of a ministerial duty and renders him liable for all damages resulting therefrom. People ex rel. Pope County v. Shelter, 318 Ill.App. 279, 47 N.E.2d 732 (4th Dist. 1943); Button v. Nevin, 44 Ariz. 247, 36 P.2d 568 (1934); State v. Title Guaranty & Surety Co. of Scranton, 27 Idaho 752, 152 P. 189 (1915); see Fidelity & Casualty Co. of New York v. Brightman, 53 F.2d 161 (8th Cir. 1931).

In sum, the court finds that there is no genuine issue of material fact; that Knight willfully disregarded his clear statutory duties set out in Sections 921 and 922 of the Illinois Savings and Loan Act; and that the Estate of Knight is liable to the depositors of City Savings for any damages resulting therefrom. The issue of damages has not been addressed by the parties and is reserved for later ruling.

### Count III

Count III involves two transactions occurring during the period June–September 1964 when the State was in custody of City Savings. Named as cross-defendants are the Estate of Knight and Justin Hulman. Throughout this period Joseph E. Knight was Director of the Department of Financial Institutions and Justin Hulman was Supervisor of Savings and Loan Associations for the Department. The receiver has orally withdrawn his motion for summary judgment as to Count III and as a result the court need only consider the Estate of Knight's motion to dismiss.

Section 853 of the Illinois Savings and Loan Act, Ill.Rev.Stat.1963, ch. 32, § 853, required the Director of the Department of Financial Institutions to segregate in a separate account all funds deposited in a savings and loan association during the period it is in state custody. Section 853 further provided that before turning over the assets of an association to a liquidator or receiver the Director "shall" return any monies collected from depositors during the period of state custody.

Count III alleges that from June 26 to June 30, 1964, during the initial period of state custody, approximately $185,000 was deposited in City Savings. Hulman Answer to First Amended Cross-Complaint, p. 8. Rather than segregate these funds in a separate account as required by Section 853, Hulman, acting under Knight's supervision, directed that they be deposited in an existing City Savings account at Manufacturers National Bank. Hulman, p. 146; Tran-script of Proceedings held on August 19 to 23, 1968, pp. 394–395. Manufacturers National Bank was a creditor of City Savings; it immediately exercised its right of set-off and seized these funds.

The Estate of Knight contends that Count III fails to state a cause of action because: 1) there are no allegations of malicious or reckless conduct; 2) the duties prescribed in Section 853 are owed to the State of Illinois and not to the depositors; and 3) the payment to Manufacturers National Bank was neither illegal nor wrongful.

It is well established that the failure of a public official to perform an act required by statute constitutes an actionable breach of a ministerial duty and renders him liable for all damages resulting therefrom. Malicious or reckless conduct need not be alleged. People ex rel. Pope County v. Shelter, 318 Ill.App. 279, 47 N.E.2d 732 (4th Dist. 1943); Button v. Nevin, 44 Ariz. 247, 36 P.2d 568 (1934); State v. Title Guaranty & Surety Co. of Scranton, 27 Idaho 752, 152 P. 189 (1915).

■ It is clear that, if Knight's failure to segregate the deposits received during the state custody of City Savings is established, it constituted an actionable breach of a ministerial duty. Further, it is obvious even from a cursory reading of the statute, that the provisions of Section 853 were enacted to protect the depositors of seized savings and loan associations. For these reasons, the Estate of Knight's motion to dismiss this portion of Count III must be denied.

Count III also alleges that Knight and Hulman in 1964 unlawfully sold various assets of City Savings in order to pay approximately $150,000 to the Central National Bank of Chicago and approximately $100,000 to the Oak Park National Bank of Chicago even though these banks had neither filed claims nor obtained judgments against City Savings.

■ The rule in Illinois is that a public official is the insurer of monies

which properly come into his possession. Barrett v. Bradford, 372 Ill. 63, 22 N.E. 2d 691 (1939); Ramsay v. Southern Illinois Penitentiary, 197 Ill. 572, 64 N.E. 549 (1902). This rule applies equally whether the funds involved are denominated public or private. Hoyt v. McGrath, 279 Ill. 550, 117 N.E. 74 (1917).

Thus, if these assets were unlawfully sold, Knight would be liable for any losses incurred as a result thereof. The receiver, however, has failed to explain why he contends that the sale of these assets was unlawful. The court tentatively denies the Estate of Knight's motion to dismiss this portion of Count III and grants the receiver 10 days within which to file a supplemental brief explaining the legal theory supporting these allegations. The Estate of Knight is granted 10 days within which to reply.

It is therefore ordered that the Estate of Knight's motion to dismiss Counts I, II and III of the Amended First Cross-Complaint shall be, and the same is hereby, denied.

It is further ordered that Justin Hulman's motion to dismiss Counts I, II and III of the Amended First Cross-Complaint shall be, and the same is hereby, denied.

It is further ordered that the receiver is granted 10 days within which to file a supplemental brief explaining the legal theory supporting certain allegations contained in Count III.

It is further ordered that the receiver's motion for summary judgment against the Estate of Knight on Counts I, II and III of the Amended First Cross-Complaint is granted as to Counts I and II and denied, at this time, as to Count III.

It is further ordered that any issues of damages raised by this court's entry of summary judgment on Counts I and II of the Amended First Cross-Complaint shall be reserved for future proceedings.